RICHARD THORNTON WILSON et al., Appellants, v. LEWISTON MILL COMPANY, Respondent.

1. LOCATION OF CONTRACT — INTENT OF PARTIES. · The question of the *locus* of a contract, and, consequently, of the state by the laws of which the contract is to be governed, must be determined with reference to the facts and circumstances surrounding the parties in each case presented; and the intention of the parties, so far as it is disclosed, must control.

2. LOCATION OF CONTRACT — ASCERTAINMENT OF INTENT. In determining to what locality a contract should be assigned, the *lex loci solutionis* and the *lex loci contractus* must both be taken into consideration, neither of itself being conclusive, but the two must be considered in connection with the whole contract and the circumstances under which the parties acted, in determining the question of their intent.

3. WHOLE CONTRACT MUST BE EMBODIED IN WRITING. While the written evidence of a contract for the sale of chattels, required by the Statute of Frauds, need not be comprised in any single document, and may be embodied in correspondence, the contract must all be collected from the writings, verbal testimony not being admissible to supply any defects or omissions in the written evidence.

4. CONTRACT FOR SALE OF COTTON BY A NEW YORK COTTON BROKER TO A MAINE MANUFACTURER — MAINE STATUTE OF FRAUDS. On November 1, 1890, H., a salesman for W. & Co., cotton brokers in New York city, who dealt in cotton which they purchased and shipped from southern states, solicited at Lewiston, Maine, from the officers of the L. Mill Co., a manufacturing corporation there located, an order for cotton. In a conversation as to shipments, terms and payments the mill company's officers stated their willingness to entertain an offer for January shipments, payable in February, and thereupon H. wrote to his firm asking that an offer be made, and an offer at ten and one-half cents was telegraphed by W. & Co. to the mill company. H. then had further conversation with the mill company's officers, in which, as he claimed, they stated that they would bid for 1,000 bales at ten and three-eighths cents, January shipments, to be delivered at Lewiston, and told him that he could transmit the bid to W. & Co., to whom he wrote accordingly. Thereupon, on November 5, W. & Co. telegraphed and wrote to the mill company that they accepted its offer and confirmed sale at ten and three-eighths. On December 5, 1890, the officers of the mill company wrote to W. & Co. that they found it would be impossible to take the cotton "mentioned in your letter of 5th ult.," as it was impossible to get funds. Thereafter W. & Co. brought an action in the state of New York against the mill company to recover damages for breach of contract to purchase 1,000 bales of cotton.

*Held*, that, under the facts, it must have been within the contemplation of the parties that the contract should be considered a Maine contract and controlled by the laws of that state;

That the facts disclosed did not constitute H. the agent of the defendant mill company, so as to make his letter to the plaintiffs, transmitting the defendant's bid, "a memorandum made or signed by the party to be charged therewith or by his agent," as required by the Statute of Frauds of Maine, as construed by the courts of that state;

That the defendant's letter of December 5 was not a recognition of the contract, as, although it referred to the plaintiffs' communication of November 5, it did not admit the making of the contract therein alluded to;

And that, in any event, the correspondence did not satisfy the Maine statute, as it did not establish the contract plainly, in all its terms, without the aid of parol evidence.

*Wilson* v. *Lewiston Mill Co.*, 74 Hun, 612, affirmed.

(Argued June 15, 1896; decided October 13, 1896.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December 26, 1893, which affirmed a judgment in favor of defendant entered upon a verdict directed by the court.

The nature of the action and the facts, so far as material, are stated in the opinion.

The Statute of Frauds of the state of Maine contains the following provision: "No contract for the sale of goods, wares or merchandise for $30 or more shall be valid unless the purchaser accepts and receives part of the goods, or gives something in earnest to bind the bargain or in part payment thereof, or some note or memorandum thereof is made and signed by the party to be charged thereby, or by his agent." (Rev. Stat. [ed. 1883], chap. 3, § 4.)

*Treadwell Cleveland* for appellants. This contract is governed by the law of the state of New York, and the Statute of Frauds of that state not having been pleaded, the defense that the contract is within the Statute of Frauds cannot be availed of. (*Mactier's Admrs.* v. *Frith*, 6 Wend. 103; *Vassar* v. *Camp*, 11 N. Y. 441; *C. P. Ins. Co.* v. *A. Ins. Co.*, 127 N. Y. 618; *Trevor* v. *Wood*, 36 N. Y. 307; *Howard* v. *Daly*, 61

N. Y. 362; *Sanders* v. *P. B. F. Co.*, 144 N. Y. 209; *P. M. Co.* v. *Hoffman*, 3 Daly, 527; *Waldron* v. *Ritchings*, 9 Abb. [N. S.] 359; *Backman* v. *Jenks*, 55 Barb. 468; *Schuenfeldt* v. *Junkermann*, 20 Fed. Rep. 359.) The fact that the cotton was to be delivered at Lewiston, Maine, does not make this a Maine contract. (*Hunt* v. *Jones*, 12 R. I. 265; *Dacosta* v. *Davis*, 24 N. J. L. 319; Whart. on Confl. of Laws, § 693; *W. C. S. Bank* v. *Low*, 81 N. Y. 566; *Dyke* v. *E. R. Co.*, 45 N. Y. 113; *L. & G. W. S. Co.* v. *P. Ins. Co.*, 129 U. S. 397.) The Statute of Frauds of the state of Maine does not apply to this contract. (*Pritchard* v. *Norton*, 106 U. S. 136; *Dacosta* v. *Davis*, 24 N. J. L. 319; Story's Confl. of Laws, § 262; *Hunt* v. *Jones*, 12 R. I. 265; *Scudder* v. *Union Bank*, 91 U. S. 412; *Cochran* v. *Ward*, 5 Ind. App. 89; *Edwards* v. *Kearzey*, 96 U. S. 595; *Kling* v. *Fries*, 33 Mich. 275; *Denny* v. *Williams*, 5 Allen, 1; *Vidal* v. *Thompson*, 11 Mart. [La.] 23; *Gross* v. *Jordan*, 83 Me. 380.) If the Statute of Frauds of the state of New York applies to this contract, it cannot be availed of by the defendant because it has not been pleaded, and it does not appear on the face of the complaint that the agreement is one prohibited by the Statute of Frauds. (*Wells* v. *Monihan*, 129 N. Y. 161; *Porter* v. *Wormser*, 94 N. Y. 443; *Crane* v. *Powell*, 139 N. Y. 379; *Hamer* v. *Sidway*, 124 N. Y. 548; *Washburn* v. *Franklin*, 28 Barb. 27; *Forward* v. *Harris*, 30 Barb. 338; Rorer on Interstate Laws [2d ed.], 83.) There is a sufficient note or memorandum in writing to satisfy the requirements of the Statute of Frauds. (Browne on Stat. of Frauds, § 344; *Justice* v. *Lang*, 42 N. Y. 521; *Peabody* v. *Speyers*, 56 N. Y. 230; *Crane* v. *Powell*, 139 N. Y. 379; *Hutchins* v. *Van Vechten*, 140 N. Y. 115; *Bird* v. *Monroe*, 66 Me. 337; *Gale* v. *Nixon*, 6 Cow. 445; *Peck* v. *Vandemark*, 99 N. Y. 29; *Sanders* v. *P. B. F. Co.*, 144 N. Y. 209; *Raubitschek* v. *Blank*, 80 N. Y. 478; *Mentz* v. *Newwitter*, 122 N. Y. 491.) The breach of the contract and the damages sustained by the plaintiffs were clearly proved. (*Stokes* v. *Mackay*, 147 N. Y. 223; *Shaw* v. *R. L. Ins. Co.*, 69 N. Y. 293; *Meyer*

v. *K. L. Ins. Co.*, 73 N. Y. 516; *Nichols* v. *S. S. Co.*, 137
N. Y. 471.)

*Edward B. Hill* and *Sullivan & Cromwell*, for respond-
ent. The objection that the contract alleged is not to be
governed by the Statute of Frauds of Maine, not having been
raised at Circuit, is not available here. (*Sterrett* v. *T. Nat.
Bank of B.*, 122 N. Y. 659; *Blair* v. *Flack*, 141 N. Y. 53; *Oli-
phant* v. *Burns*, 146 N. Y. 218.) If the point could be raised
it has no merit; for, if any contract ever was made, it was
made in Maine; and, even if made in New York, it would
be governed by the law of Maine — the place of perform-
ance. (3 Am. & Eng. Ency. of Law, 561; *Jewell* v. *Wright*,
30 N. Y. 259; *Curtis* v. *D., L. & W. R. R. Co.*, 74 N. Y.
116; *H. Nat. Bank* v. *Lacombe*, 84 N. Y. 367; *Forward* v.
*Harris*, 30 Barb. 338.) No contract at all was proven.
(*Hough* v. *Brown*, 19 N. Y. 111; *B. S. Co.* v. *M. C. R.
Co.*, 134 N. Y. 15; *Jenness* v. *M. H. I. Co.*, 53 Me. 20.)
There was no error in the exclusion of testimony at the trial.
(Browne on Stat. of Frauds, §§ 367, 368; *Horton* v. *McCarty*,
53 Me. 394.) No sufficient memorandum within the require-
ments of the Statute of Frauds of Maine was shown. (*Jen-
ness* v. *M. H. I. Co.*, 53 Me. 20.)

HAIGHT, J. This action was brought to recover damages
for an alleged breach of contract to purchase 1,000 bales of
cotton of the plaintiffs, to be delivered to the defendant at
Lewiston, Me. The answer contained a general denial, an
allegation to the effect that the alleged contract was within
the Maine Statute of Frauds and that by a custom of the
cotton trade no contract of sale arose under an offer unless
accepted on the same day that the offer was made. The
plaintiffs were cotton brokers engaged in business in the city
of New York; the defendant, a manufacturing corporation
located at Lewiston, Me.

On the 1st day of November, 1890, one Hawley, in the
employ of the plaintiffs as a salesman, called at the defend-

ant's place of business in Lewiston, Me., and had a conversation with its president and treasurer with reference to selling cotton. In his testimony he states the conversation as follows:

"They had already bought a good deal of cotton, but that they were inclined to think well of the market and that they would be pleased to buy more cotton provided they would not have to pay for it before February 1st; that they had bought at present all that their bank facilities allowed them to pay for, but that by February 1st, they would be in position to pay for the cotton, and if they could buy cotton the payment of which would come at that time, they would be inclined to accept an offer. I told them we could do that by arranging to sell them cotton for January shipment, and I explained somewhat, also, our mode of operation and the *modus operandi* of doing that. * * * After all that they asked me to make an offer based on contracts, and I told them I would make such an offer; that we would base it in this way and that we would send them an offer; that I would write to the firm asking them to send them an offer based upon January contracts at a certain price, whatever that price happened to be at the time the firm made the offer, and that that, based on January contracts, would mean this, that if at the time when their reply to our offer reached the firm, if the market was higher by more than two points, we were not to be held by our offer; but that if the market should be lower by as much as six points, that is, $\frac{6}{100}$ of a cent, they were to have the cotton at $\frac{1}{16}$ cent of a pound less than our offer."

He then tells us that he forwarded to his firm, under date of November 1st, 1890, the following letter:

"DEAR PERCEY: * * * While at Lewiston, I also saw Mr. Barker, the Pres., and Mr. Parker, the Treas., (Eustis has resigned; make change in spinners' book) of the Lewiston Mills. They have already bought 3,500 bales, all they can pay for at present, but are bullish and would like to buy or engage a good part of the rest of the cotton. They need about 2,500 bales. I have arranged with them that you shall make

them an offer of 500 B. C. middling and 500 B. C. strict mid-
dling, all January shipment. Terms of payment cash on
arrival, so as to bring payments in February. Make the offer
and say in your telegram to them, 'based on January con-
tracts,' whatever the price is on Monday, the understanding
between them and me being that, if they accept your offer
and January contracts are not more than two points above the
figure named in your telegram, the sale is to stand, with the
proviso, however, that if January contracts are six points
lower when you hear from them, the price is to be $\frac{1}{16}$ cent
below your offer. I will be in Lewiston about 3 P. M. Mon-
day, but do not wait for that, but telegraph your best offer to
them as early in the day as you can. If you can offer the
middling @ 10$\frac{3}{8}$ and the strict middling @ 10$\frac{1}{2}$, I am quite
sure they will accept, and they may do so if you make a round
price at 10$\frac{1}{2}$ cents. I do not think they will go higher than
that. But if you cannot get down to the figures I have
named, make the best offer you can. This order, if we get it,
can be filled from Alabama, Southwest Georgia, Mississippi,
Texas or Arkansas, at our option. Everybody I have met so
far has had offers in hand of middling Texas at 10$\frac{1}{4}$ and mid-
dling uplands at 10 cents to 10$\frac{1}{8}$ cents. Mr. Barker, of the
Lewiston Mills, handed me a telegram from Fowler, of Gads-
den, Ala., offering him mid. at 10 cents, so Mr. Johnson had
better hunt up another Gadsden · correspondent for us and
scratch Fowler off our books. This letter goes in the train
leaving here 5 P. M. Saturday, and should reach you early
Monday morning. Having two such large (and I will add
hopeful) trades in prospect, I concluded to remain in this
vicinity over Monday. If nothing happens, I will leave here
for Marysville 11 o'clock Monday night. I sent you a second
telegram from here announcing my purpose of remaining here
and asking you to write to-day to this hotel.

"Yours, &c.,

"F. B. HAWLEY."

In answer to this letter, under date of November 3, 1890,
the plaintiffs wired the defendant:

"We will sell 500 middling and 500 strict middling, January shipment, 10½ landed, based on January contracts nine sixty-three."

Late in the afternoon of Monday, Hawley returned to the defendant's, and was there shown the dispatch received from the plaintiffs. He then had a further talk with the defendant's president and treasurer, in which, as he testifies, they finally made a bid of 10⅜ and told him that he could transmit it to the plaintiffs, and that they could have until Wednesday noon to reply, and that thereupon he wrote the plaintiffs as follows:

"LEWISTON, ME., *November* 3, 1890.

"DEAR PERCEY:  *  *  *  Here at Lewiston Mr. Barker had an offer from Blaisdell of mid. Texas at 10⅛ cents. A week ago, when the contracts were some 30 points higher, Woodward & Stillman offered them mid. and strict mid., January shipment, at 10½ cents. They would not, therefore, pay that price, nor even bid 10$\frac{7}{16}$ cents, although I tried hard to get them to do so. They did, however, too late in the day to telegraph you, make me a bid of 10⅜ cents, for 500 B. C. mid. and 500 B. C. strict mid., terms and conditions same as those mentioned in my letter of Saturday. I saw your telegram to them offering them these cottons at 10½ cents, based on January at 9$\frac{63}{100}$, but 10⅜ cents is just ¾ cents above contracts and certainly would seem to be a very good bid, but you can judge better than I both the tone of the market and whether the already marvelous difference between contracts and spots is likely to widen. Remember this order can be filled with good staple Alabama and Mississippi as well as with Texas and Arkansas. As to-morrow is a holiday I have not wired this bid to you, as you will not be at the office, and as this letter goes to Boston at 11.30 to-night, it is sure to reach you early Wednesday morning. You are to reply to Lewiston Mills Wednesday morning. I hope you will be able to accept their bid for the 1,000 bales, and I do not think they will pay more, certainly not 10½ cents, but if you cannot accept please so inform them by wire and name a price at

which you will sell. It is possible that they would come up $\frac{1}{16}$ cent if the market is not lower when they hear from you.

"Yours, &c.,

"F. B. HAWLEY."

"You understand the Lewiston Mills bid is good until noon Wednesday, November 5th; that is, you are to telegraph at or before that time."

In answer to this letter the plaintiffs wired the defendant, under date of November 5th, 1890, as follows:

"Your offer accepted, 10⅜, 500 middling and 500 strict middling, January shipment, delivered Lewiston."

And on the same day they wrote as follows:

"New York, *November* 5, 1890.

"Lewiston Mills Co., Lewiston, Me.:

"Dear Sirs: We hereby confirm our sale to you of 500 B. C. mid. landed Lewiston, January shipment, cash on arrival, at 10⅜ per pound, and 500 B. cotton St. middling, January shipment, cash on arrival, at 10⅜ per pound.

"Thanking you for the order,

"Yours truly,

"R. T. WILSON & CO.,

"Per Walker."

To which the defendant replied, under date of December 5th, 1890, as follows:.

"R. T. Wilson & Co., New York:

"We find it will be impossible for us to take the 1,000 bales of cotton mentioned in yours of the 5th ult., as it is impossible to get the funds. Our payments for the next three months are all we can meet without taking any more burdens. The hope that the present stringency in the money market would cease soon seems certain not to be realized.

"Yours truly,

"F. W. PARKER, *Treas.*"

At the conclusion of the plaintiffs' evidence the defendant read in evidence the Statute of Frauds of Maine, together

with the decision of the highest court of that state, made in the case of *Jenness* v. *The Mt. Hope Iron Co.* (53 Me. 20). The defendant then read in rebuttal the cases of *Horton* v. *McCarty* (53 Me. 394); *Bird* v. *Munroe* (66 Me. 337), and *Williams* v. *Robinson* (73 Me. 186). The letters written by Hawley to the plaintiffs, to which we have alluded, were offered in evidence, but, under objection of the defendant, were excluded.

This is in substance the evidence bearing upon the questions presented for review. The defendant moved for a direction of a verdict on the ground that no contract had been proved binding upon the defendant and upon the ground that it was in conflict with the laws of the state of Maine. This motion was granted and an exception was taken by the plaintiffs.

It is now contended that the contract was a New York contract and not a Maine contract, and that consequently it is not controlled by the Statute of Frauds of Maine. Owing to the great number of cases appearing in the books bearing upon this question its solution is involved in some difficulty. The transactions of the business world are so numerous and of such a variety that it is difficult, if not impossible, to formulate a general rule that should control in all cases in the determination of such a question. In some cases the place where the contract was accepted has been considered as controlling. In others, where the contract of affreightment was made, and still others, the place where the contract is to be performed. (*Mactier* v. *Frith*, 6 Wend. 103; *Vassar* v. *Camp*, 11 N. Y. 441; *Crown Point Iron Co.* v. *Ætna Ins. Co.*, 127 N. Y. 618; *Trevor* v. *Wood*, 36 N. Y. 307; *Howard* v. *Daly*, 61 N. Y. 362; *Sanders* v. *P. B. F. Co.*, 144 N. Y. 209; *Waldron* v. *Ritchings*, 9 Abb. Pr. [N. S.] 359; *Backman* v. *Jenks*, 55 Barb. 468; *Schuenfeldt* v. *Junkermann*, 20 Fed. Rep. 359; *Hyde* v. *Goodnow*, 3 N. Y. 266; *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397; *Wayne Co. Savings Bk.* v. *Low*, 81 N. Y. 566; *Jewell* v. *Wright*, 30 N. Y. 259; *Curtis* v. *D., L. & W. R. R. Co.*, 74 N. Y. 116; *Dickinson*

v. *Edwards,* 77 N. Y. 573; *Hibernia Natl. Bank* v. *Lacombe,*
84 N. Y. 367; *Green* v. *Lewis,* 26 U. C. [Q. B.] 618; *In re
Missouri Steamship Co.,* 42 Chancery Div. 321; *Hamlyn &
Co.* v. *Talisker Distillery,* L. R. [App. Cas. 1894] 208.)·

There are numerous other cases, but those above cited suffi-
ciently call attention to the various subjects that have con-
trolled the minds of the courts in determining like questions
to that under consideration. A further discussion of them we
do not deem necessary or profitable, for, as has well been stated,
the question must be determined with reference to the facts
and circumstances surrounding the parties in each case pre-
sented, and the intention of the parties so far as it is dis-
closed must control. The place where the contract is
accepted is important. It fixes the time that the minds
of the parties met and the contract consummated. It
does not, however, necessarily determine the place, or the
law under which the contract must be executed. So, also,
is the place important where the contract was talked
over, and its substantial details arranged. Yet this, stand-
ing alone, may not control, for the place in which the
contract is to be executed is of equal importance in determin-
ing what must have been the intention and purpose of the
parties. The *lex loci solutionis* and the *lex loci contractus*
must both be taken into consideration, neither of itself being
conclusive, but the two must be considered in connection with
the whole contract, and the circumstances under which the
parties acted in determining the question of their intent. We
have in much detail already called attention to the facts. We
have but briefly to refer to them again in order to make reason-
ably certain the intention of the parties. The plaintiffs were
not merchants selling goods from their store located in the
city of New York, or as such receiving orders from salesmen
for their approval. They were dealers in cotton, which they
purchased and shipped from Alabama, Mississippi, Texas or
Arkansas. The goods were not in store where they could be
examined and their quality tested. This could only be done
upon the arrival of the cotton at its destination. The plain-

tiffs sent Hawley, their servant and agent, to the defendant to
sell cotton.    Its officers had already purchased heavily and did
not care to purchase more before February.    Much discussion
appears to have taken place between the defendant's president
and the plaintiffs' salesman, all at the company's mills in Maine.
All the details with reference to the January shipments and
payments, and to the *modus operandi,* were there talked over
and arranged.    The defendant's officers then announced their
willingness to entertain an offer for January shipments, and
then the first letter was written by Hawley to his firm asking
that an offer be made.    An offer of 10½ cents was forwarded
by the plaintiffs to the defendant's officers.    Had they
accepted the offer the acceptance would have been made in
the state of Maine, and then, under the plaintiffs' theory, it
would have been a Maine contract.    But this offer was not
accepted.    The plaintiffs' agent again returned to the defend-
ant's mill, had another interview with its president and treas-
urer, and finally succeeded in getting a bid, which he says he
was authorized to transmit to the plaintiffs, of 10⅝, and which
was accepted.    This bid was received in Maine by the plain-
tiffs' agent.    All the talk and negotiation had taken place
in Maine.    The cotton was to be delivered to the defendant in
Maine, there to be inspected and paid for ; and it appears to
us that there is no escape from the conclusion that it must
have been within the contemplation of the parties that the
contract should be considered a Maine contract and controlled
by the laws of that state.    This was evidently the under-
standing of the parties at the time of the trial.    The defend-
ant interposed in its answer the Statute of Frauds of that
state.    Both parties introduced decisions of the highest court
of that state bearing upon the construction of the Statute of
Frauds of that state.    The motion for a direction of a verdict
was based upon that ground, and there is not a word or a sug-
gestion appearing in the record on behalf of the plaintiffs
claiming or intimating that it was a New York contract.

Was there any note or memorandum of the contract made
and signed by the defendant's officers or agents ?    It is not

claimed that they made or signed any paper in connection with the transaction. The only thing that it is claimed that they did do was to authorize Hawley, the plaintiffs' salesman, to transmit to his firm the offer mentioned ; that in writing these letters he was their agent and that they were bound thereby. The statute, however, was to prevent frauds. Oral contracts for sales in small amounts are not fraudulent. It is only where the amount exceeds a certain fixed sum that the statute requires some written memorandum signed by the party to be bound or by his agent. The alleged contract in this case was for the purchase of goods to an amount of $50,000. The answer denies that any contract whatever was made. Hawley, according to his own testimony, was concededly working for the interests of the plaintiffs. He says : " I was anxious to secure an order from the defendant ; that was what I went there for." If he by his oral testimony can establish his authority to make offers of purchase on behalf of the defendant, then the Statute of Frauds would be of but little use or protection ; for a party, or his agent, could prepare the memorandum in his own interest and then by his oral testimony establish its validity as against the opposing party. Browne on the Statute of Frauds, at sec. 367, says : " The statute does not require the party's own signature to the memorandum, but allows it to be signed by some other person thereunto by him lawfully authorized. * * * One rule, however, has been settled, both under the 4th and 17th sections, that neither party can be the other's agent to bind him by signing the memorandum."

Reed on Statute of Frauds, at sec. 369, says : " One of the contracting parties cannot be the agent to make the memorandum."

In 1 Greenleaf on Evidence, sec. 268, it is said : " It is not necessary that the written evidence required by the Statute of Frauds should be comprised in a single document, nor that it should be drawn up in any particular form. It is sufficient if the contract can be plainly made out in all its terms from any writings of the party, or even from his correspondence, *but*

*it must all be collected from the writings, verbal testimony
not being admissible to supply any defects or omissions in
the written evidence.* For the policy of the law is to prevent
fraud and perjury by taking all the enumerated transactions
entirely out of the reach of any verbal testimony whatever."

In *Jenness* v. *Mt. Hope Iron Co.* (53 Me. 20–24), Walton,
J., says: "Such a memorandum may be contained in the
written correspondence of the party, but the correspondence
taken together must establish the contract plainly in all its
terms or it will not be sufficient. It can receive no aid from
parol evidence. The policy of the law is to prevent perjury
by making it impossible for a party to profit by it."

In *Hinckley* v. *Arey* (27 Me. 362) it was held as a general
principle that the same individual cannot be the agent of both
parties.

In *Strong* v. *Dodds* (47 Vt. 348) it was held that the
agent of the plaintiff to sell goods could not be regarded as
the agent of the defendant in writing a letter ordering goods
for the defendant; that the letter was not such a memorandum
or note of the contract as was contemplated by the Statute of
Frauds.

The defendant's letter of December 5th is not a recogni-
tion of the plaintiffs' contract. It does refer to the plaintiffs'
communication of the " 5th ult.," but it does not admit the
making of the contract therein alluded to. It merely says,
" We find it will be impossible for us to take the 1,000 bales
of cotton mentioned in yours of the 5th ult." It then gives
reasons, want of funds, etc. It nowhere concedes that an
offer had been made by them and accepted by the plaintiffs.

The judgment should be affirmed, with costs.

All concur (Bartlett, J., in result).

Judgment affirmed.