HARRIS ROBBINS CHILDS and Others, Copartners Doing Business under the Firm Name and Style of CHILDS, PARR & JOSEPH, Appellants, *v.* C. E. RILEY COMPANY, Respondent.

First Department, March 7, 1919.

Sale — Statute of Frauds — memorandum — bought and sold notes delivered by broker — action for breach of contract to deliver goods — ratification of unauthorized act of seller's agent — estoppel — erroneous nonsuit.

Where a broker, as a middleman, negotiating a sale of goods for a buyer and seller, signs and delivers to both parties bought and sold notes which are retained by them there is a sufficient memorandum to take the case out of the Statute of Frauds, which rule is still in force.

*It seems,* that the rule does not hold where the sale is negotiated by an employee of one of the parties only.

Evidence in an action to recover for a breach of contract to sell and deliver goods examined and *held,* that it was error to dismiss the complaint at the close of the plaintiff's case as it might be inferred that the person who negotiated the sale was a middleman or broker and that the plaintiff was entitled to the benefit of this inference.

Where the middleman or broker knew that contracts of sale had to be approved by the seller's main office in another State, the contract of sale cannot be established by the testimony of the broker that a salesman in the defendant's employ in this State told him that the contract of sale was accepted, for the authority of the salesman cannot be established by his statement to the broker.

However, where the defendant's general manager in this State knew that the broker had sent sold notes to his office, but made no effort to return them and they were never returned, and did not stand upon the local salesman's lack of authority to make the sale, but merely insisted, against the buyer's protest, that the seller had a right to change the terms at any time during the contract and where a representative from the home office of the seller made no claim that the salesman who accepted the contract lacked authority and the sales notes were in fact retained so that the buyer could have been held upon the contract, the seller was not in a position to repudiate the sale, there being either a ratification or estoppel, conceding to the plaintiff the most favorable inferences from the proof. Hence it was error to dispose of the issue as a matter of law.

PAGE, J., dissented.

APPEAL by the plaintiffs, Harris Robbins Childs and others, from a judgment of the Supreme Court in favor of the defend-

ant, entered in the office of the clerk of the county of New York on the 29th day of May, 1918, upon a dismissal of the complaint by direction of the court at the close of plaintiffs' case.

The action was brought to recover damages for the breach of two contracts for the sale of goods bought by the plaintiffs from the defendant.

*William Henry Corbitt*, for the appellants.

*Paul R. Towne* of counsel [*Edwin S. Lewis* with him on the brief; *Harris & Towne*, attorneys], for the respondent.

SHEARN, J.:

Plaintiffs are engaged in the export and import business in the city of New York. Defendant is a foreign corporation, having its principal place of business in Boston, but it maintains an office for the transaction of its business in New York city in charge of one Evans. The contracts were negotiated by one Hinck, a cotton goods broker in the city of New York. On Friday, August 11, 1916, Hinck called at the New York office of the defendant and informed Evans that the plaintiffs were in the market for 1,500 bales of certain cotton goods if they could be purchased on certain unusual terms and credit, namely, two per cent ten days, sixty days extra, which means a credit of seventy days with a credit of two per cent if paid at that time. Evans said that the proposed terms would have to be submitted to the Boston office of the defendant, and, after reaching an agreement on price and finding that the goods could be had at the mill with which the defendant dealt, submitted the offer to the defendant's Boston office. On Saturday morning, August twelfth, Hinck twice telephoned to defendant's New York office and was informed by McCoy, defendant's salesman in the New York office, that defendant was waiting for a credit report and that Hinck would be informed as soon as an answer was received. On Monday morning, August fourteenth, Hinck telephoned again and was informed by McCoy that no reply had come. About noon of the same day, Hinck again telephoned and McCoy said that the New York office had heard

from the Boston office and he told Hinck " to send him up a sales note for these 1,500 bales." Hinck then told McCoy that he had another order for 1,200 bales of a different kind of cotton, and McCoy said " he would take it up." Later in the afternoon, Hinck telephoned McCoy, who stated " that the mill had accepted that order, and to be sure to send up [his] sales notes or contracts as quickly as possible." Later that same day, Hinck again telephoned McCoy for some information in regard to the name of the defendant's goods, and was asked by McCoy " to send up those sales notes as promptly as possible." Hinck told McCoy he would send them up the first thing the following morning. On that same day Hinck sent broker's bought notes to the plaintiffs and on the following morning, August fifteenth, Hinck sent to McCoy brokers' sold notes, addressed to the defendant. All of the bought and sold notes were signed by the broker. On Friday, August eighteenth, Hinck was informed by McCoy that " they heard from the Boston house; that they would not accept the terms." In the afternoon of that day Hinck called up Evans from the plaintiffs' office and was told that the defendant had " the right to change the terms any time they wanted to during the contract," and that if the plaintiffs " did not agree to that, he could not accept the contract." Other conversations followed, at which the defendant maintained that it had a right to change the terms " at any time during the life of the contract," to which the plaintiffs would not agree, and the upshot of it was that the defendant refused to deliver, resulting in this suit.

The defendant denied that any binding contracts had been made and pleaded the Statute of Frauds. (See Pers. Prop. Law [Consol. Laws, chap. 41; Laws of 1909, chap. 45], § 85, as added by Laws of 1911, chap. 571.) If Hinck was not plaintiffs' purchasing agent but was a broker or middle-man, as is clearly inferable from the testimony, his signing and delivering the bought and sold notes, which were retained by the respective parties, constituted a sufficient memorandum to take the case out of the Statute of Frauds. (*Newberry* v. *Wall*, 84 N. Y. 576.) The learned trial justice was of the impression that this well-recognized authority and leading case no longer states the law and that its authority has been

First Department, March, 1919. [Vol. 186.

impaired by *Wilson* v. *Lewiston Mill Company* (150 N. Y. 314). In this he was in error. In the *Wilson* case the alleged contract was not negotiated by a broker but by a salesman in the employ of the plaintiff who called upon the defendants, negotiated with them and then wrote his firm suggesting that his firm make an offer based on his conversations with the defendant. Such offer was made by the plaintiff to the defendant but was never accepted, and it was of course held that the written offer of the plaintiff to the defendant based upon negotiations of plaintiff's salesman with defendant was not a sufficient writing to take the case out of the Statute of Frauds. In *Strong* v. *Dodds* (47 Vt. 348), cited in the opinion in the *Wilson* case and referred to by the learned trial justice, it was similarly held that one of the contracting parties cannot be the agent to make the memorandum, and that the agent of the plaintiff to sell goods cannot be regarded as the agent of the defendant in writing a letter ordering goods for the defendant. These cases obviously have no application to a case where the bought and sold notes are signed by one who is not the purchasing agent of one of the parties but is engaged in the independent and well-recognized business of broker. The defendant contends that Hinck was in effect plaintiffs' purchasing agent, but even if there was evidence that would warrant such a finding, unquestionably there was an abundance of evidence from which it might be inferred that Hinck was a mere middleman or broker, and upon a motion to dismiss the complaint the trial justice was required to give the plaintiffs the benefit of this inference.

Another feature of the case, however, presents a more serious question. It was of course necessary for the plaintiffs to prove that Hinck was authorized to sign the bought and sold notes as a broker for the defendant. Some of Hinck's dealings were with Evans, the general manager of defendant's New York office, but most of the negotiations were between Hinck and McCoy, who was a mere salesman connected with the New York office. There was no direct evidence that McCoy had authority to conclude the contracts and authorize Hinck to sign the bought and sold notes. There can be no claim of apparent authority, for Hinck knew that the contracts had to be approved by the defendant's main

office in Boston. McCoy informed Hinck that the defendant's main office had accepted the contracts and he directed Hinck to send the sold notes to the New York office, which Hinck did. But McCoy's authority cannot be established by his statements to Hinck. It appears, however, that Evans, the general manager of the New York office, knew that Hinck had sent the sold notes to his office on August fifteenth, and that, notwithstanding his knowledge of business and trade usages, Evans made no effort to return the notes and they were never returned by the defendant. Instead, Evans allowed three days to pass, and when called up on the afternoon of August eighteenth by Hinck, concerning McCoy's notification just given to Hinck that the Boston office would not accept the terms, Evans made no point about McCoy's authority, but merely said that the defendant had " the right to change the terms any time they wanted to during the contract," and that if the plaintiffs " did not agree to that, he could not accept the contract." On August twenty-first Mr. Woodruff, of defendant's Boston office, came to New York and had a conference with one of the plaintiffs, Mr. Childs, at which conference Hinck, Evans and McCoy were present. Childs testified that he asked Evans, in the presence of Woodruff, " Why did you not return those notes the next day if they were not proper? " and that " Mr. Evans hesitated and finally said that he was not bound to return those notes, and then I asked him if he did not think it would have been advisable to return those notes, because if he had returned them that day no harm would have been done; I could have gone out into the market and covered myself perfectly well. I asked him if he did not think it would have been advisable. He did not reply, but his principal, Mr. Woodruff, said it would have been advisable." Then Mr. Childs testified that he had a further conversation with Mr. Woodruff in which the latter said that he would rely on the Statute of Frauds as against any trade custom that ever existed, but that after a long discussion Mr. Woodruff said that he would try to arrange the matter satisfactorily to all parties concerned. According to this testimony, Mr. Woodruff, who concededly represented the defendant, made no claim that McCoy was not authorized to conclude the negotiations with Hinck and did not claim that he had not

informed McCoy over the telephone that the Boston office accepted the contracts. Neither did Evans, the general manager of defendant's New York office, claim that McCoy acted without authority, nor did Evans assign any reason for retaining the sold notes. The retention of the sold notes worked an obvious disadvantage to the plaintiffs, for the defendant was in a position where it could hold the plaintiffs to the contract, yet, according to defendant's contention, the plaintiffs could not hold the defendant. I am of the opinion that the retention of these sold notes for three days, coupled with defendant's failure to make any point of McCoy's lack of authority when the controversy was fresh, called for evidence from the defendant to meet plaintiffs' evidence from which McCoy's authority might be inferred upon the principle of ratification and also of estoppel. Concededly the evidence of McCoy's authority is not strong, but, even if it be called weak, it must be recollected that we are dealing with a dismissal of the complaint at the close of plaintiffs' case, on which plaintiffs are entitled to the most favorable consideration in drawing inferences from the proof. Uncontradicted and unexplained, I think this state of the proof warranted an inference of McCoy's authority to authorize the broker to sign the bought and sold notes and that it was error to dispose of this issue as a matter of law.

The judgment should be reversed and a new trial ordered, with costs to appellants to abide the event.

CLARKE, P. J., DOWLING and SMITH, JJ., concurred; PAGE, J., dissented.

Judgment reversed and new trial ordered, with costs to appellants to abide event.