J. K. WELDING CO., Inc., Plaintiff,

v.

W. J. HALLORAN STEEL ERECTION CO., Defendant.

Civ. A. No. 2441.

United States District Court
D. Rhode Island.

Oct. 27, 1959.

Francis J. Kiernan, Archibald B. Kenyon, Jr., Providence, R. I., for plaintiff.

Raymond J. McMahon, Jr., of McMahon & McMahon, Providence, R. I., for defendant.

DAY, District Judge.

This is an action to recover damages for breach of contract. The plaintiff is a corporation organized under the laws of the State of New York; the defendant is incorporated under the laws of the State of Rhode Island. Jurisdiction is based upon diversity of citizenship and the existence of a controversy in the requisite amount. 28 U.S.C.A. § 1332(a)(1).

The complaint alleges in material part that on July 5, 1955, the plaintiff and the defendant entered into a written contract whereby the defendant agreed to perform the structural steel erection for the job designated as the "Massachusetts Turnpike Authority Contract #51–021"; that the defendant was to be paid at the rate of $31.50 per ton for its work; that, in addition, the defendant was to be paid $5 per ton for trucking and unloading steel in connection therewith; that on February 15, 1956, said contract was amended in writing in certain respects; that on October 24, 1956, the defendant notified the plaintiff of its withdrawal from said contract; that thereafter the plaintiff demanded performance on the part of the defendant; that the plaintiff's demand was never answered by the defendant; and that the plaintiff stood ready at all times to perform all of its obligations under said contract. A copy

of said contract and of the written amendment thereto is annexed to the complaint.

The complaint further alleges that, by reason of the foregoing, the plaintiff was compelled to re-let the work; and that the lowest bid which the plaintiff then received for said work was $53.50 per ton, an increase of $17 per ton over the price for which the defendant had previously contracted to perform said work. The plaintiff seeks damages in the sum of $20,000, together with interest from December 1, 1956 and the costs of this action.

The defendant, in its answer, admits the execution of said contract and of the rider thereto; but alleges by way of defense that, by letter dated October 10, 1956, the plaintiff positively manifested its intention not to perform its obligations under said contract, and that the defendant's duty to perform thereunder was discharged thereby. The answer further alleges that the defendant was at all times ready to perform its obligations under said contract immediately upon the plaintiff's first fulfilling certain conditions precedent contained in said contract. Finally, the defendant states that it is without knowledge sufficient to form a belief as to the truth of the averments of the complaint relative to the re-letting of the work and to the price paid therefor, and leaves the plaintiff to the proof of such facts.

The evidence adduced at the trial established that in June, 1955 the plaintiff entered into a sub-contract with a general contractor which held a contract with the Massachusetts Turnpike Authority for the construction of certain highways and bridges in the Commonwealth of Massachusetts. Under its sub-contract, the plaintiff obligated itself to furnish and fabricate the steel for two bridges and an overpass, and to erect them. These structures were to be erected in accordance with certain plans and specifications prepared by the engineers of said Turnpike Authority which were made available to and examined by a representative of the plaintiff before it entered into said sub-contract. The contract for the erection of these structures was known as "Massachusetts Turnpike Authority Contract 51-021". These plans and specifications showed that all holes in the structural steel for the insertion of rivets to secure said steel when erected would be $^{15}/_{16}''$ in circumference; and provided further that the holes in the steel for the expansion dams would be $^{11}/_{16}''$ in circumference when delivered on the site for erection and would be reamed to $^{15}/_{16}''$ when placed in position. No other provision for field reaming was made in said plans and specifications.

Sometime in 1955, these plans were made available to the defendant which, after examining them, submitted a proposal to the plaintiff for doing the erection work required under the former's sub-contract. This proposal, entitled "Re Massachusetts Turnpike Contract 51-021 Lee-Beckett" and dated July 5, 1955, was subsequently accepted by the plaintiff on January 23, 1956. In its proposal the defendant offered to do said erection work (including trucking) at the price of $36.50 per ton, in accordance with the conditions set forth therein. This proposal was in the form adopted by the New England Steel Erectors Association and contained many apparently standard and usual conditions, of which only two are pertinent here. There were the following:

"1. The Customer shall notify the Erector at least 48 hours before each erection operation is to commence.

"2. Where details are not available at the time estimate is made all material will be fabricated in a manner so as to reduce the field labor as far as possible. All prices are based on plans submitted for estimate."

On January 23, 1956, the parties executed a rider modifying certain conditions of the proposal; but those modifications are of no import in this controversy.

The evidence further establishes that subsequent to July 5, 1955 and before January 23, 1956 (when plaintiff executed a formal acceptance of said proposal and the rider thereto), the plaintiff began the preparation of its own shop drawings for the fabrication and erection of the steel. There is credible evidence that these were completed by March, 1956. During the preparation of these drawings, the plaintiff apparently discovered that if the holes were punched or reamed full-size in its shop in accordance with the plans of the Turnpike Authority, a skew in the bridge would result. Accordingly, the plaintiff's drawings as completed called for the reaming of an additional 8,700 holes by the defendant on the job site. Although these drawings were completed by March, 1956, they were not shown or delivered to any representative of the defendant until October 2, 1956. On that date the plaintiff's chief engineer, Robert Freeman, and the defendant's operations manager, Edward Prescott, met by chance on the job site. At this meeting a discussion occurred between them concerning the reaming of the requisite holes in the structural steel to be supplied by the plaintiff. Freeman then informed Prescott that the plaintiff had decided to send the steel to the site with all the holes punched $^{11}\!/_{16}''$; and that said holes would have to be reamed by the defendant to $^{15}\!/_{16}''$ in the field. Prescott protested that the defendant had not agreed to do any field reaming except that specified in the plans prepared by the Turnpike Authority. At this time, Freeman also produced a set of the drawings prepared by the plaintiff showing that all holes in the steel would be punched by the plaintiff to $^{11}\!/_{16}''$ and reamed in the field to $^{15}\!/_{16}''$.

This discussion was followed by a letter from the defendant, signed by Prescott and dated October 3, 1956, which the plaintiff claims it did not receive until October 10, 1956. The pertinent paragraphs of this letter were as follows:

"At our meeting on the site yesterday, Mr. Freeman spoke of sending the beams through with the field splice holes punched undersized to be reamed in the field. I requested that this not be done and wish to repeat that request. We do not have any allowance in our price for this reaming which will be a substantial item.

"If the steel has already been fabricated with these holes undersized, I suggest that you arrange to have the reaming done by your own forces or send us an order to perform this work.

"Also on drawings, #4, 5, 6, 11, 12, and 13, notes indicate that all holes for field rivets are to be punched $^{11}\!/_{16}''$ and reamed to $^{15}\!/_{16}''$ in the field. Can you explain this to me? All holes should be $^{15}\!/_{16}''$ except those connecting the expansion dam to the structure. I would appreciate a quick reply on these items."

The plaintiff replied to this letter by registered mail on October 10, 1956, stating in material part:

"With regard to your contention concerning the reaming of holes for the field connections, we cannot agree * * * that it should be done by the J. K. Welding Co., either through a contractual obligation or under standard procedure of the A.I.S.C.

"In order to resolve this issue, which must be resolved without delay, we request that Mr. Halloran, Mr. Prescott, and Mr. Moran, who negotiated the contract with us, please meet in our offices at Yonkers at the earliest possible date."

The evidence establishes that arrangements were thereafter made by the parties for such a meeting in Yonkers; that Messrs. Prescott and Moran left Providence for Yonkers by automobile on the morning of October 16th for this purpose; and that en route a tragic accident occurred in which Moran was killed and Prescott seriously injured. Upon their failure to appear in Yonkers on October 16th, as contemplated, the plain-

tiff telephoned the defendant and was advised of said accident.

Thereafter, according to the plaintiff, it tried without success on several occasions to reach the defendant's president by telephone. Finally, on October 22nd, Freeman succeeded in reaching him. A telephone conversation then ensued between the presidents of the respective parties. According to the president of the plaintiff, he reiterated his request for a conference between the parties "so we can resolve our difficulties (which have) arisen on account of the reaming of holes". He also testified that he told the defendant's president that the plaintiff "had laid out the steel on false work to form the skew", and that "without gambling we are going to ream to $15/16''$," and "most of it we will ream to about $13/16''$." According to him, the defendant's president then replied: "We are not coming to see you; we are loaded up with a lot of work on hand and we are cleaned out on the supervision." His version of this conversation was corroborated by Freeman, who apparently listened to it on an extension.

Subsequent to this telephone conversation, the defendant, by its president, sent the following telegram to the plaintiff on October 24th:

"Re Contract 51–021 Because of Difficulties That Have Arisen We Wish to Advise You That We Are Withdrawing from This Contract As Erectors."

The defendant's president testified that he did not recall any such conversation; and maintained that the defendant was not lacking in supervisory employees on October 22nd. He insisted that he sent the foregoing telegram because he considered the plaintiff's letter of October 10th a repudiation of its contractual obligations, in that the plaintiff was endeavoring to make the defendant responsible for substantial work not called for by its contract.

The plaintiff's evidence shows that after the receipt by it of said telegram, it tried unsuccessfully to reach the de-

fendant's president by telephone. On November 8, 1956, the plaintiff notified the defendant by registered mail that it was shipping out fabricated steel for said contract 51–021, and demanded that defendant proceed immediately in accordance with its contract. In said letter it also notified the defendant that if it did not proceed with the work, the plaintiff would let the work to another erector and would hold the defendant responsible for any damages sustained by reason of its failure to perform said work. There is, however, no evidence to indicate that the plaintiff did in fact ship out said steel to the job site on November 8th, or immediately thereafter. The defendant made no reply to this letter. On November 16th, the plaintiff telegraphed the defendant that, owing to its failure to reply to said letter and to proceed with its work, the steel erection work was being re-let, and that the plaintiff would hold the defendant liable for all damages sustained by it.

The evidence further shows that on November 26, 1956 the plaintiff concluded a contract with the firm of Farrell & Gregory, of Pittsfield, Massachusetts, for the steel erection work on said contract 51–021 at a price "not to exceed" $53.50 per ton. Under this contract Farrell & Gregory obligated itself to do the field reaming of 8,700 holes in the structural steel, which reaming was not required of the defendant under its contract. The total amount of steel erected by Farrell & Gregory was 824.6754 tons, and its charge therefor amounted to $44,035.15. When payment thereof was not made by the plaintiff, suit was instituted against it by Farrell & Gregory. This litigation resulted in an eventual settlement for the sum of $42,762.54. Under the defendant's contract, the total amount payable by its terms would have been $30,-100.65.

The first and basic issue in this case is whether or not the defendant's withdrawal from its contract was, as it claims, justified by the plaintiff's prior repudiation of its obligations thereunder. While it is not entirely clear where the

contract was eventually made, it is undisputed that it was to be performed in the Commonwealth of Massachusetts. Under the circumstances, it seems fair to assume that the parties intended the law of Massachusetts to govern their obligations under said contract. Compare Turner Construction Co. v. W. J. Halloran Steel Erection Co., 1 Cir., 1957, 240 F.2d 441. See also Peresipka v. Elgin, Joliet & Eastern Ry. Co., 7 Cir., 1956, 231 F.2d 268, 59 A.L.R.2d 554; United States-Alaska Packing Co. v. Luketa, 9 Cir., 1932, 58 F.2d 944; Clark v. State Street Trust Co., 1930, 270 Mass. 140, 169 N.E. 897; Wilson v. Lewiston Mill Co., 1896, 150 N.Y. 314, 44 N.E. 959.

■ The defendant contends, in effect, that plaintiff's conduct as aforesaid amounted to a breach by anticipation. Although the doctrine of anticipatory breach, so-called, is widely accepted, it is clear that Massachusetts is among the small minority of jurisdictions which will not entertain an action for damages for the anticipatory breach of a contract. In Porter v. Supreme Council American Legion of Honor, 1903, 183 Mass. 326, 67 N.E. 238, at page 239, the Supreme Judicial Court held:

"We regard it as settled in this commonwealth that where a contract is to be performed at a certain time, or on the happening of a certain event, a declaration by one party that he will not perform it when the time comes does not give a present right of action."

To the same effect, see Nevins v. Ward, 1946, 320 Mass. 70, 67 N.E.2d 673; Tirrell v. Anderson, 1923, 244 Mass. 200, 138 N.E. 569; Daniels v. Newton, 1874, 114 Mass. 530.

This is not to say, however, that the courts of that commonwealth accord no legal effect to a breach by anticipation; and the defendant, claiming that the plaintiff was guilty of such a breach, seeks here to rely upon it as a defense to this action.

■ It is well settled that in order to constitute an anticipatory breach of contract sufficient to give rise to an immediate right of action in favor of a promisee, the intention of the promisor not to perform must be unqualified and unequivocal. The rule has been well stated in Wells v. Hartford Manilla Co., 1903, 76 Conn. 27, 55 A. 599, at page 602:

"The renunciation must be so distinct that its purpose is manifest, and so absolute that the intention to no longer abide by the terms of the contract is beyond question."

See also, Roehm v. Horst, 1900, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953; Campos v. Olson, 9 Cir., 1957, 241 F.2d 661; Rabouin v. National Labor Relations Board, 2 Cir., 1952, 195 F.2d 906.

■ But where the prior conduct of one party to a contract is set up as a justification for rescission by the other party thereto, rather than as the basis for an action for damages by the latter, a different test prevails. In 5 Williston on Contracts (Rev. ed. 1937) § 1315, the learned author says:

"Indeed, even if it be assumed that repudiation before the time for performance should give rise to an immediate right of action, it is impossible satisfactorily to make identical requirements concerning the anticipatory conduct which will furnish a defense and that which will afford ground for an action."

That this distinction is embodied in the law of Massachusetts is abundantly clear. See, e. g., Nevins v. Ward, supra; Earnshaw v. Whittemore, 1907, 194 Mass. 187, 80 N.E. 520.

The question then becomes—what conduct by a party to a contract, short of a positive and unequivocal repudiation, will justify a rescission of the contract by the other contracting party in advance of the time set for performance? An examination of the applicable authorities convinces me that the better rule gives the right of rescission to a party to a contract if the other party thereto manifests doubt as to his willingness or ability to perform his obligations substantially in accordance with the terms

590

of such contract. See 1 Restatement, Contracts § 280; 5 Williston on Contracts (Rev. ed. 1937) § 1331. And this is without question the Massachusetts rule. See, e. g., Nevins v. Ward, supra; Ragan v. Dyer, 1930, 272 Mass. 495, 172 N.E. 597; Stephenson v. Cady, 1875, 117 Mass. 6; cf. National Machine & Tool Co. v. Standard Shoe Machine Co., 1902, 181 Mass. 275, 63 N.E. 900; Martin v. Meles, 1901, 179 Mass. 114, 60 N.E. 397.

■ The evidence in the case at bar clearly establishes that under the contract the defendant had no overall duty to ream the holes for the field connections. On the contrary, the specifications [1] prepared by the Turnpike Authority expressly called for field reaming for certain connections at the expansion dams, and made no further provision for field reaming. This circumstance convinces me that all other holes in the steel were to be punched or reamed to proper size in the shop by the fabricator before delivery of the steel to the erector. "Expressio unius est exclusio alterius". I conclude, therefore, that the interpretation of the contractual obligations of the respective parties purportedly adopted by the plaintiff was patently erroneous.

The credible evidence and the reasonable inferences to be drawn therefrom satisfy me that the plaintiff knew at the time of its acceptance of the defendant's proposal on January 23, 1956 that the structures in question could not be erected in a satisfactory manner if the only holes reamed in the field were those specified in the plans of the Turnpike Authority. It did not disclose this information to the defendant at that time; in fact, it refrained from disclosing said information until October 2, 1956 when it first displayed its shop drawings to Prescott, many months after their completion. When the defendant protested

that its contract required it to ream only the holes connecting the expansion dams and that no additional field reaming was contemplated by its contract, the plaintiff insisted that the defendant was obligated to do this additional reaming under its contract, although qualifying its stand by requesting a conference. Similarly, it is significant that in the telephone conversation of October 22nd, accepting the plaintiff's version thereof, the plaintiff again insisted that the defendant was obligated by said contract to do whatever field reaming the plaintiff deemed to be desirable from its standpoint, regardless of the clear provisions of said contract. Viewing this conversation in the light most favorable to the plaintiff, the conclusion is inescapable that the plaintiff was insisting upon a palpably incorrect interpretation thereof and was manifesting that it would not substantially perform its obligations thereunder. In my opinion the plaintiff's course of conduct and its statements gave the defendant ample grounds to believe that the plaintiff was unwilling to perform its contractual obligations in accordance with said contract. The plaintiff was making a bold attempt to "impose an onerous condition not contemplated by the original contract, and to which the defendant was not required to submit." [2]

I find and conclude that the defendant was justified in rescinding said contract on October 24th; that its action was the result of the plaintiff's manifestation of its unwillingness to perform its obligations substantially as stipulated in said contract; that notice of its rescission was seasonably communicated to the plaintiff; and that there was no breach of contract on the part of the defendant.

Judgment, therefore, will be entered in favor of the defendant.

1. These specifications were specifically referred to in the contract between the parties. Prints thereof governed the work to be performed by all contractors and subcontractors on the Turnpike project,

which fact was fully understood by both the plaintiff and the defendant when the contract between them was executed.

2. Stephenson v. Cady, supra, 117 Mass. at page 9.