ELTON CLARK & others *vs.* STATE STREET TRUST COMPANY.

Suffolk.     April 9, 1929. — January 27, 1930.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, WAIT, SANDERSON, & FIELD, JJ.

*Equity Pleading and Practice,* Master: rulings of law, findings of fact; Appeal. *Lien. Contract,* Construction. *Conflict of Laws. Evidence,* Extrinsic affecting writings. *Equity Jurisdiction,* Equitable lien, He who seeks equity must do equity.

A master, to whom was referred a suit in equity "to hear the parties and their evidence, to find the facts, and report the same to the court," has no authority to make determinative rulings of law.

Where the record before this court upon appeals from an interlocutory and a final decree in a suit in equity included a report of a master under a rule not giving him authority to make determinative rulings of law and it appeared that the master had made such rulings, this court sustained exceptions to the rulings of law and, in determining the suit, disregarded them.

Upon an appeal from a final decree in a suit in equity which has been heard by a master whose report contains no report of evidence, this court, with reference to the facts found by the master and the power and duty to draw inferences therefrom, is in the position of the trial court and reaches its own conclusions, unaffected by conclusions reached by the trial court.

The owner of an interest in a process for cracking oil, desirous of selling rights therein to the government of France, which was in extraordinary need of gasoline for war purposes during the Great War, needed a supply of oil for demonstration and sale purposes and for that purpose in 1917 made in the State of New York with a trust company and with holders of stock in a corporation which held certain oil property in Mexico under lease, who knew his desire and plan, an option agreement looking to a purchase of such stock, a portion of the purchase price to be paid to the trust company within thirty days, and five other payments to be made at intervals ending in 1920, a specified portion of the stock to be transferred to the trust company on the first payment, and, on the fourth payment, the stock to be transferred to the name of the purchaser but still to be held by the trust company until final payment by the purchaser,

when all was to be delivered to him; payments made by the purchaser were to be distributed to the stockholders proportionately as made; upon failure of the purchaser to make the stipulated payments, the stock was to be returned to the stockholders. At the time such option agreement was made, the stockholders and the purchaser knew that the corporation's lessor had brought suit in a district court in Mexico to have the leasehold declared forfeited, and, coincidentally with the making of the option agreement, they made a supplemental agreement, to which the trust company was not a party, that the purchaser should not be required to make the final payment until that suit "shall have been dismissed or decided favorably to the defendants" and that, in the event of the suit "being decided advers[e]ly to the defendants and the leasehold held to have been forfeited," the stockholders would return all payments made by the purchaser with interest at six per cent, and would receive from him their stock. Upon the question of the construction of the contracts arising in a suit in equity, it was *held*, that the two contracts executed at the same time and as parts of the same transaction were to be construed together, even though the trust company did not sign the supplemental agreement.

When it does not appear that a contract was made with a purpose of the parties that it was to be performed in a particular place other than that where it was made and was to be construed as to its validity and meaning as well as to its mode of performance by the law of that other jurisdiction, the nature of the contract obligation and its interpretation are governed by the law of the place where it was made.

While it is a rule of law, generally to be followed, that, in interpreting a will, contract or statute, words used in one undoubted sense in one place in the writing may be presumed to be used with the same meaning in another place, such rule is not inflexible, but is to be used as an aid and not as an end in construction, the aim of all interpretation of writings being to ascertain the meaning intended to be attached to the words by the parties who used them and to effectuate the true purpose of the parties as thus ascertained.

A business contract is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end.

Every contract implies good faith and fair dealing between the parties to it, and the courts always avoid, if possible, any construction of a contract that is unreasonable or inequitable.

Under the option agreement above described, the purchaser made the first payment, which the trust company distributed to the stockholders. The due date of the next payment was February, 1918. In December, 1917, the Mexican district court, the court of first instance, decided the suit against the corporation. In February, 1918, the stockholders and the purchaser made a new agreement in writing reciting that the corporation was proceeding to have the district court decision reversed by an appellate court, that they were desirous of having the purchaser make the second payment and that he was willing to do so, but that such payment should be received by the trust company as such payment with the understanding that the payment should

not be taken, held or construed as a waiver, relinquishment or modification of the rights of the purchaser, as provided in the first supplemental agreement, resulting from the judgment of the Mexican district court, nor as a commitment or obligation on his part to make any further payments under the option agreement while that judgment should remain in force and effect. The trust company received and distributed such second instalment after having been furnished copies of such agreement and of the preceding supplemental agreement. Subsequent agreements were made between the purchaser and the stockholders extending to May, 1918, the time for the making of the third payment, each providing that in all other respects the option agreement and the second supplemental agreement should "remain in full force and effect." In May, 1918, the purchaser elected not to make the third payment. In March, 1919, the Mexican appellate court reversed the decision of the district court. While the plaintiff in that suit was contemplating taking the case to a higher court, it was settled by a payment to him of a substantial sum of money by a successor in title to the corporation. The stockholders then desired their shares for transfer to a new holder, and, owing to conflicting claims of the parties, the trust company received from the stockholders the amounts that it had distributed to them from the purchaser's payments with interest, "on the understanding that such moneys were . . . received without prejudice and were to be held for payment to whatever person or persons might be entitled thereto," and delivered the shares to the stockholders who transferred them to the new holder, successor to their rights. The new holder thereupon brought a suit in equity against the trust company and the purchaser to obtain the moneys thus on deposit, and the purchaser by a cross bill also sought the moneys. *Held*, that

(1) The words "decided advers[e]ly" in the first supplemental agreement referred to an adverse decision by any court of competent jurisdiction, regardless of whether that decision might be reversed on appeal;

(2) By the decision of the Mexican district court declaring the lease forfeited, the "suit" was "decided advers[e]ly to the defendants" within the meaning of those words in the first supplemental agreement, and thereby the stockholders each became obligated to return to the purchaser forthwith all payments made by him to the trust company for their use;

(3) The provision in the first supplemental agreement that, in the event that the suit in the court of Mexico was decided adversely to the defendants therein, the stockholders should return forthwith to the purchaser the cash paid by him to the trust company and by it distributed to them, "and shall respectively receive from the Grantee [the purchaser] their stock in the Leasing Company, together with any dividends thereon received by the Grantee [the purchaser]," although, speaking strictly, the purchaser did not hold the stock and could not return it, were construed as a recognition of rights of the purchaser in the stock by way of security to him, so that the stock could not be returned to the stockholders without his consent;

(4) The words above quoted constituted an acknowledgment by the stockholders of rights of the purchaser in the stock to the extent that it could not be returned without the satisfaction of those rights;

(5) The later deposit of the money in the hands of the trust company by the stockholders as the basis of the withdrawal of the stock was a continued acknowledgment of those rights of the purchaser, with the additional factor that the trust company was a party to that arrangement and was to hold that money "for payment to whatever person or persons might be entitled thereto";

(6) The circumstances and facts collectively were sufficient to establish an equitable lien in favor of the purchaser on the money deposited with the trust company for the satisfaction of whatever claim he might be able to establish against it;

(7) The plaintiffs, having come into equity to assert rights to such money, must do equity with respect to it;

(8) Both the law of New York and that of this Commonwealth led to the foregoing result.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on February 11, 1921, and described in the opinion. The defendant Alfred Adams by leave of court filed a cross bill.

The suit was referred to a master. Material findings by the master are stated in the opinion. The suit was heard by *Pierce*, J., upon certain motions respecting and exceptions to the master's report.

Rulings by the single justice and a final decree entered by his order are described in the opinion. Both parties appealed.

The case was argued at the bar in April, 1929, before *Rugg*, C.J., *Wait, Sanderson, & Field*, JJ., and afterwards was submitted on briefs to all the Justices.

*H. S. Davis & J. N. Miller* of New York, for the defendant Adams.

*E. F. McClennen*, for the plaintiffs.

RUGG, C.J. The plaintiffs, as trustees under a declaration of trust created in 1919 under the name Boston Mexican Petroleum Trustees, bring this bill to recover money deposited by their assignors with the State Street Trust Company. The defendant Adams, by cross bill against the plaintiffs and State Street Trust Company, seeks to recover the same money. The present controversy grows out of attempts by certain stockholders of the Boston Mexican

Leasing Company, an oil corporation, to sell their stock to Adams, who was attempting to buy that stock because he owned a new process for cracking oil called the "Adams-Day Process" which he thought he would be able to sell to the French government or to French capitalists, if he could obtain a large supply of crude oil to be used in demonstrating the value of his process and to be sold with it. To secure this supply of oil Adams wanted to get an option to purchase the stock of the Boston Mexican Leasing Company, the ownership of which would give him control of the larger part of the oil produced by the Harmon Well oil property in Mexico.

On November 15, 1917, a contract entitled "Option Agreement," executed in New York, was entered into between two corporate and seven individual owners of stock in the Boston Mexican Leasing Company (hereinafter called the Leasing Company), parties of the first part, described in the agreement as Grantors and herein to be referred to as Depositors, Adams, as party of the second part, therein described as Grantee, and the State Street Trust Company (hereinafter called the Trust Company), as party of the third part. Some of the Depositors are trustees under the declaration of trust and as such are parties plaintiff to this suit; others are not parties. By the option agreement the Depositors, who were owners of a large part of the capital stock of the Leasing Company, gave Adams an option to buy that stock for $1,170,400, payable in instalments: the first of $15,000, payable within thirty days from the date of the agreement; the second of $10,000, payable on or before February 15, 1918; the third of $45,000, payable on or before April 1, 1918, and three other payments to be made at designated dates, the last being July 1, 1920. Upon payment of the first instalment a specified portion of the certificates of stock indorsed in blank were to be deposited with the Trust Company to be held pursuant to the terms of the agreement. Upon payment of the fourth instalment the certificates were to be transferred to and in the name of Adams, or his assignees or nominees, and the new certificates issued were to be held by the Trust Company until the pay-

ment of the last instalment, when they would be delivered to Adams. The payments made by Adams to the Trust Company were to be forthwith distributed by it, proportionately, to the Depositors. The option agreement provided that upon failure of Adams to make payments in accordance with its terms the Trust Company should forthwith redeliver to the Depositors the stock of the Leasing Company held by it.

The principal asset which gave value to the stock of the Leasing Company was the lease of an oil well in Mexico. Before the option agreement was executed, the lessor had brought suit in Mexico to have the leasehold declared forfeited. At the time of the execution of the option agreement, and as a part of the same transaction, the Depositors made a contract with Adams designated "Supplemental Agreement," to which the Trust Company was not a party, providing, among other things, that Adams should not be required to make the final payment due on July 1, 1920, until that suit "shall have been dismissed or decided favorably to the defendants"; that in the event of the suit "being decided advers[e]ly to the defendants and the leasehold held to have been forfeited the Grantors shall each return to the Grantee forthwith all payments made by him to them respectively with interest thereon at the rate of six per cent. (6%) per annum from the date of such payments, and shall respectively receive from the Grantee their stock in the Leasing Company"; that "if the decision in said suit" should be that the leasehold has not been forfeited, but should hold the defendants liable for money damages for the nonoperation of the well or otherwise, the Depositors should each, to the extent of the payments received or to be received by them under this agreement and no more, pay their respective proportions of such judgment which shall be in such proportion to the whole judgment as the interest of each Depositor shall bear to the aggregate interest of the Depositors.

It was known to the Depositors at the time said agreements were executed that Adams entered into said agreements with the expectation of negotiating in France for the

funds necessary to effect the purchase of the Leasing Company stock and could not complete the purchase unless he could raise funds in this manner. It was known to the Depositors, prior to and at the time that the said agreements were executed, that Adams owned an interest in a process for cracking oil to get gasoline, known as the "Adams-Day Process," and contemplated causing the erection of a plant in France for demonstrating the value of said process and interesting therein the Government of France and capitalists in France, and that he needed, for such purpose, a large supply of oil and was interested in the purchase of the stock of the Leasing Company, for the sake of obtaining such supply of oil while the Great War was pending and the government of France was in extraordinary need of gasoline for war purposes.

Adams made the first payment within the time allowed by the option agreement and in accordance therewith it was distributed by the Trust Company to the Depositors.

A short time thereafter, in December, 1917, the Mexican district court in which the action had been pending entered judgment, declaring the lease forfeited. The master found that an adverse decision of this sort had been regarded by the Depositors and by Adams as beyond the bounds of reasonable possibility. An appeal was promptly taken by the Leasing Company, carrying the case to an appellate court.

On February 13, 1918, the Depositors and Adams entered into an agreement reciting that the parties had been informed of the judgment of the Mexican district court; that the Leasing Company had moved to have the judgment vacated, and had perfected an appeal to be operative in event of such motion to vacate being denied; that notwithstanding the judgment the Depositors were desirous of having Adams pay the second instalment and Adams was ready and willing, subject to the terms and provisions of "this Agreement," which were likewise acceptable to the Depositors, to make the payment. The parties therein agreed that Adams would make the payment due February 15, 1918, to be received, held and applied by the Trust Company as a payment of the second instalment under the

terms of the option agreement, with the understanding that this should not be taken, held or construed as a waiver, relinquishment or modification of the rights of Adams, as provided in the supplemental agreement, resulting from the judgment of the Mexican district court. The agreement of February 13, 1918, provided that such rights were to continue unimpaired as to the payment of both instalments, and that the payment should not be taken, held or construed as a commitment or obligation on the part of Adams to make any further payments under the option agreement while that judgment should remain in force and effect. When the second payment was made to the Trust Company it was notified of the decision of the district court in Mexico. At the same time it received copies of the supplemental agreement and of the agreement of February 13, 1918. This second payment was distributed by the Trust Company to the several Depositors in accordance with the terms of the option agreement.

On March 27, 1918, the Depositors and Adams made an agreement extending the time for payment of the third instalment from April 1, 1918, to May 10, 1918, and therein provided "That in all other respects the said agreements of November 15, 1917, and the said agreement of February 13, 1918, shall remain in full force and effect." In May, 1918, Adams elected not to pay the third instalment and he made no payments thereafter. He demanded return of the money paid by him and notified the Trust Company that it should hold the stock on deposit until he was repaid by the Depositors.

On March 22, 1919, an appellate court in Mexico reversed the decision of the district court of Mexico. The plaintiff in that suit was contemplating taking the case to a tribunal having jurisdiction to reverse the decision of the appellate court for any error of law, when the case was settled by the payment to him, by the present plaintiffs, of a substantial sum of money, and the judgment of the appellate court reversing the first decision stood as the final judgment in the case. There was no decision of any Mexican court thereafter made declaring the leasehold forfeited.

In April or May, 1919, the Depositors, being desirous of exchanging their shares in the Leasing Company for shares in the Boston Mexican Petroleum Trustees, requested the Trust Company to return their certificates. The Trust Company was advised by counsel for the Depositors that, as he understood the supplemental agreement, if Adams had rightfully rescinded the contract and was guilty of no default in the case, each Depositor should pay the Trust Company the amount of the payments received by him, with interest, before he would be entitled to receive from the Trust Company his stock; and was advised by counsel for Adams by letter that his position was that, upon the return to it by the Depositors of the amounts distributed to them out of his payments under the option agreement, with interest, the Trust Company was authorized to return the deposited shares in respect to which such reimbursement was made. The Trust Company informed a representative of the Depositors that "it was willing to receive money in place of the shares at the rate mentioned in that letter, on the understanding that such moneys were to be received without prejudice and were to be held for payment to whatever person or persons might be entitled thereto." Thereafter the payments thus suggested were made by the respective Depositors to the Trust Company, amounting in all to $25,000 and interest. The plaintiff trustees thereafter reimbursed the individual Depositors and thereby acquired the stock and whatever right the individual Depositors had in the fund deposited. The stock passed from the possession of the Trust Company to the plaintiffs.

The case was referred to a master "to hear the parties and their evidence, to find the facts, and report the same to the court." When exceptions to his report came on for hearing, the single justice denied the defendant Adams's motion to strike out parts of the report, ruled that the form of reference excluded the right on the master's part to make rulings of law, and that upon a consideration of the undisputed facts in the light of New York decisions the words "decided advers[e]ly" in the supplemental agreement of November 15, 1917, refer to an adverse decision by any

court of competent jurisdiction, regardless of whether that decision may be reversed on appeal. He ruled that the extrinsic facts excluded by the master but found by him to be proved were not admissible in evidence because the words "decided advers[e]ly" were not ambiguous. He also ruled that when the bill of complaint was filed the Depositors had a right to have the stock, or the money which stood in place of it, returned to them without reimbursing Adams for the money he had paid them under the agreements. An interlocutory decree overruling exceptions to the report and confirming the report was entered, and by final decree the cross bill was dismissed with costs to the plaintiffs, and the Trust Company was directed to pay the plaintiffs the amount deposited, with interest, less a sum to be retained by it on account of its charges and expenses.

The plaintiffs appealed from so much of that decision as dealt with the interpretation of the phrase "in the event of said suit being decided advers[e]ly." The defendant Adams appealed from the order denying his motion to strike out parts of the report, from the orders and rulings of the single justice other than his ruling as to the meaning of the words "decided advers[e]ly," from the interlocutory decree overruling his exceptions to the master's report and confirming it, and from the final decree. The position of the Trust Company as stated in its answer is that it received the money paid by the Depositors as trustee under the agreement dated November 15, 1917, and is ready and willing and offers to pay the sum, subject to such compensation, costs and expenses as it may properly retain, to such person or persons as may by the court be decreed to be entitled thereto.

The foregoing facts are found by the master, who was directed to find and report the facts. Since the evidence is not reported, his findings of facts must be accepted as true. The form of the reference by implication denied to the master authority to make rulings of law except within narrow limits. *Borden* v. *Bradley*, 223 Mass. 575, 586. Such rulings, therefore, will be disregarded.

In considering the master's report without the report of evidence, this court is in the position of the trial court and

reaches its own conclusions regardless of what has hitherto been decided. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 333. The two contracts executed at the same time and as parts of the same transaction are to be construed together, even though the Trust Company did not sign the supplemental agreement. *Knowles* v. *Toone*, 96 N. Y. 534, 537. *Hine* v. *Bowe*, 114 N. Y. 350, 355. *Brokaw-Eden Manuf. Co.* v. *Lockerbie*, 237 Mass. 463, 466. *Makepeace* v. *Harvard College*, 10 Pick. 298, 302.

The nature of a contract obligation and its interpretation commonly are governed by the law of the place where the contract is made. *Carnegie* v. *Morrison*, 2 Met. 381, 397, 398. *Carmen* v. *Higginson*, 245 Mass. 511, 516. *Papadopulous* v. *Bright*, 264 Mass. 42, 46. *Lennon* v. *Cohen*, 264 Mass. 414, 425, and cases cited. *Baxter National Bank* v. *Talbot*, 154 Mass. 213, 215, 216. *Ross* v. *Ross*, 129 Mass. 243, 246. *King* v. *Sarria*, 69 N. Y. 24, 32. A limitation upon this general rule appears to arise when it is manifest that the contract was made with a purpose by the parties that it is to be performed in a particular place and is to be construed as to its validity and meaning as well as to its mode of performance by the law of that other jurisdiction. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203 Mass. 159, 174, and cases cited. *Mittenthal* v. *Mascagni*, 183 Mass. 19, 22. *Gaston, Williams & Wigmore of Canada, Ltd.* v. *Warner*, 260 U. S. 201, 202, 203. *Wilson* v. *Lewiston Mill Co.* 150 N. Y. 314, 323. *Mayer* v. *Roche*, 48 Vroom, 681, 682, 683. *Benaim & Co.* v. *Debono*, [1924] A. C. 514, 520. *Richard* v. *American Union Bank*, 241 N. Y. 163. See articles with collection of cases by Beale, 23 Harv. Law Rev. 1, 79, 194, 260.

The first question to be decided is the meaning of the words in the supplemental agreement referring to the suit pending in the courts of Mexico: "In the event of said suit being decided advers[e]ly to the defendants and the leasehold held to have been forfeited," the depositors shall return to Adams all payments made by him. Stated more specifically with reference to the facts, the question is, whether those words mean any decision by any court com-

petent to take jurisdiction of the suit, in the case at bar the Mexican district court, or the final decision of the highest court undertaking to pronounce decision on the suit. It is manifest that the controversy now pending as to the meaning of these words might have been averted by sufficient amplification. The contract would have been equally valid whether referring in express terms either to any such decision or to such final decision. The words actually used, standing by themselves alone, are ambiguous. They may refer to either such decision. This ambiguity is not dissolved by reference to other provisions of the supplemental agreement to the effect that the final payment need not be made "unless and until said suit shall have been dismissed or decided favorably," or that, if "the decision in said suit" should be that the leasehold has not been forfeited but that the defendants were liable for money damages, certain consequences follow. The meaning in those connections need not be determined; it is not necessarily the same as in the vital sentence now under consideration. It has frequently been said that, in interpreting a will, contract or statute, words used in one undoubted sense in one place may be presumed to be used in the same meaning in another place in the writing. *Hall* v. *Hall*, 209 Mass. 350, 353. *Gillen's Case*, 215 Mass. 96, 98. *Gagnon's Case*, 228 Mass. 334, 338. *Attorney General* v. *Armstrong*, 231 Mass. 196, 211. *Bay State Street Railway* v. *Woburn*, 232 Mass. 201, 203. *Raymer* v. *Tax Commissioner*, 239 Mass. 410. *Eustace* v. *Dickey*, 240 Mass. 55, 76. *Commissioner of Banks in re Prudential Trust Co.* 244 Mass. 64, 71. *Marcus* v. *Street Commissioners of Boston*, 252 Mass. 331, 334, 335. *Hood Rubber Co.* v. *Commissioner of Corporations & Taxation*, 268 Mass. 355, 357. This so called presumption is an aid and not an end. It is generally to be followed but it is not inflexible. It yields to the main purpose, which is to find out what the writing means as a whole. *Ware* v. *Minot*, 202 Mass. 512, 516. *Edyvean* v. *Archer*, [1903] A. C. 379, 384. *Watson* v. *Haggitt*, [1928] A. C. 127. *Regina* v. *Allen*, L. R. 1 C. C. 367, 373, 374. *Henry* v. *Trustees*, 48 Ohio St. 671, 676. The

aim of all interpretation of writings is to ascertain the meaning intended to be attached to the words by the parties who used them, and to effectuate the true purpose of the parties as thus ascertained. All rules are ancillary to that dominating aim.

If it be assumed that the interpretation of the supplemental agreement is to be governed by the law of New York, there is strong argument based on adjudication by the courts of that State in support of the contention of Adams that as matter of law the crucial words, "decided advers[e]ly," refer to a decision by any court of competent jurisdiction, and not to a decision by a court of last resort, or to a final decision, or to a decision by the highest court exercising jurisdiction over the suit. Adams was not a party to that suit. It seems unlikely that the parties could have intended to tie him up to the final decision by a court in litigation to which he was not a party and which he was powerless to hasten to a conclusion. *Wadsworth* v. *Green,* 1 Sandf. 78, 81. *Heagney* v. *Hopkins,* 52 N. Y. Supp. 207, 210, 211. *Woodruff* v. *Woodruff,* 52 N. Y. 53. Strong as are these New York decisions, we prefer to interpret the crucial words of the supplemental agreement in the light of relevant knowledge of the parties at the time it was signed. It is the law of New York as well as of this Commonwealth that, where the meaning of words is doubtful, oral evidence of the conduct and circumstances of the parties at the time is admissible, not to change or vary the contract as made but to clarify it by showing the situation of the parties with reference to its subject matter. Every contract is to be interpreted in the light of all the material facts cognizable by those who executed it, and in a manner to give effect to the chief design to be accomplished by the instrument. To that end pertinent facts may be proved by parol evidence. *Stoops* v. *Smith,* 100 Mass. 63. *Smith* v. *Vose & Sons Piano Co.* 194 Mass. 193, 200. *Jennings* v. *Puffer,* 203 Mass. 534. *Eustace* v. *Dickey,* 240 Mass. 55, 72. *W. R. Grace & Co.* v. *National Wholesale Grocery Co. Inc.* 251 Mass. 251, 254. *Schmittler* v. *Simon,* 114 N. Y. 176. *Rickerson* v. *Hartford Fire Ins. Co.* 149 N. Y. 307, 314–315. *Kitching* v. *Brown,* 180 N. Y. 414, 419, 420.

*Middleworth* v. *Ordway*, 191 N. Y. 404, 415, 416.   *United Surety Co.* v. *Meenan*, 211 N. Y. 39, 45, 46.   The construction of a written instrument to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties.   It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end. *Old Colony Street Railway* v. *Brockton & Plymouth Street Railway*, 218 Mass. 84, 91, and cases cited.   *Washington & Idaho Railroad* v. *Coeur D'Alene Railway & Navigation Co.* 160 U. S. 77, 101.   *Christian* v. *First National Bank*, 155 Fed. Rep. (C. C. A.) 705, 709.   Equity looks through the form to the substance and purpose of the agreement and moulds its decree in accordance with what the parties may fairly be presumed to have intended.   Every contract implies good faith and fair dealing between the parties to it.   The courts always avoid, if possible, any construction of a contract that is unreasonable or inequitable.   *Simon* v. *Etgen*, 213 N. Y. 589, 595.   The parties in the case at bar knew that an adverse decision by any Mexican court of competent jurisdiction would embarrass and in all probability defeat the plan of Adams to raise money in France. They knew that the only method he had of financing the purchase of the stock of the Leasing Company and his only chance of doing so was by raising money there.   The parties knew also, as men of honor, that it would not be "good faith and fair dealing" on his part to attempt to go forward with the proposed adventure in France in the face of an adverse decision by any court of competent jurisdiction in Mexico. The circumstances when the option agreement and the supplemental agreement were made, and the subsequent conduct of the parties, indicate that the words "decided advers[e]ly" were intended to have the meaning for which Adams contends.

Our conclusion upon this branch of the case is that, by the decision of the Mexican court rendered in December, 1917, declaring the lease forfeited, the "suit" was "decided advers[e]ly to the defendants" within the meaning of those words in the supplemental agreement, and that thereby the

Depositors each became obligated to return to Adams forthwith all payments made by him to the Trust Company for their use.

No discussion is required to demonstrate that Adams has done nothing to forfeit his rights in this particular or to estop or bar him from asserting his rights.

The second question is whether Adams is entitled to receive out of the funds in the hands of the Trust Company the amount due him from the Depositors. The pertinent facts in that connection have already been narrated. The Depositors had placed their stock in the Leasing Company with the Trust Company and received from the Trust Company distribution of the cash payments made to it by Adams, all in conformity to the option agreement. When it had become apparent that that agreement would not be carried out, they wanted to get their stock in the Leasing Company from the Trust Company in order that it might be transferred to the plaintiffs under some new arrangement. The Trust Company refused to deliver that stock to the Depositors unless Adams gave his consent. He refused consent unless the Depositors would pay to the Trust Company the money which Adams asserted to be due him from the Depositors, being the amount already paid by him and distributed to them by the Trust Company. Accordingly the Depositors placed with the Trust Company the equivalent of the cash so received by them. The stock was then withdrawn and passed into the possession of the plaintiffs. The plaintiffs, having thus secured that stock of the Leasing Company from the Trust Company, have reimbursed the Depositors for the cash so deposited by them and have acquired whatever rights the individual Depositors had in that money in the hands of the Trust Company. The plaintiffs succeed to the rights and to the obligations of the Depositors with respect to the cash in the hands of the Trust Company so far as Adams is concerned. They had full notice of all the circumstances. Their rights in that cash are subject to all the claims of Adams. They stand in the shoes of the Depositors. It was provided in the supplemental agreement (to which the Depositors and Adams

were the parties) that, in the event that the suit in the court of Mexico was decided adversely to the defendants therein, the Depositors should return forthwith to Adams the cash paid by him to the Trust Company and by it distributed to them, "and shall respectively receive from the Grantee [Adams] their stock in the Leasing Company, together with any dividends thereon received by the Grantee [Adams]." Speaking strictly, Adams did not hold the stock and could not return it. The stock was held by the Trust Company pursuant to the terms of the option agreement of even date with the supplemental agreement. These two agreements, as already pointed out, are to be construed together. The words just quoted from the latter agreement must be given weight. It is a canon in the interpretation of contracts that every word and phrase must be presumed to have been employed with a purpose, and must be given a meaning and effect whenever reasonably possible. *Ferguson* v. *Union Mutual Life Ins. Co.* 187 Mass. 8, 10. *Goldsmith* v. *Traveler Shoe Co.* 221 Mass. 482, 485. *Koshland* v. *Columbia Ins. Co.* 237 Mass. 467, 475. *Dahlstrom Metallic Door Co.* v. *Evatt Construction Co.* 256 Mass. 404, 414. The quoted words cannot rightly be treated as inserted by mutual mistake. There is no finding to that effect. They are to be construed as a recognition of rights of Adams in the stock by way of security to him, so that the stock could not be returned to the Depositors without his consent. The Trust Company was not a party to the supplemental agreement. The parties to it were the Depositors on the one side and Adams on the other. These parties held all rights, legal and equitable, in the shares of stock of the Leasing Company deposited or to be deposited with the Trust Company. They had competency as between themselves to make any agreements and to create any legal or equitable rights touching the stock in the hands of the Trust Company. The words already quoted constitute an acknowledgment by the Depositors of rights in the stock by Adams to the extent that the stock could not be returned without the satisfaction of those rights. The later deposit of the money in the hands of the Trust Company by

the Depositors as the basis of the withdrawal of the stock was a continued acknowledgment of those rights of Adams, with the additional factor that the Trust Company was a party to that arrangement and was to hold that money "for payment to whatever person or persons might be entitled thereto." This deposit was made apparently about April, 1919. The reversal of the adverse decision of the district court in Mexico had already taken place. By the time of this deposit of cash, the parties had asserted their final positions. It was manifest that Adams would never want or take the stock. The deposit of money was not security for the delivery of the stock. That had gone or was going to the plaintiffs as third persons to the original transactions. The deposit of cash was in continued recognition of the rights of Adams. The purpose of the parties was that the stock, and the money deposited in its place when the stock was withdrawn, were equitable security to be held by the Trust Company for whatever claim Adams might be able to establish against it. Although the Trust Company was a party to the option agreement alone, after receiving notice of the other agreements between the Depositors, the plaintiffs and Adams, it became bound by the knowledge thereby acquired as to the rights of the parties. All these circumstances and facts collectively were sufficient to establish an equitable lien in favor of Adams on the cash deposited with and now in the hands of the Trust Company. That is the result of our own cases. *Westall* v. *Wood,* 212 Mass. 540, and cases cited. *Meteor Products Co. Inc.* v. *Société d'Electro-Chemie et d'Electro-Métallurgie,* 263 Mass. 543, 548, 549. To the same general effect are *Johnson* v. *Root Manuf. Co.* 241 U. S. 160, and *Beacon Trust Co.* v. *Dolan,* 27 Fed. Rep. (2d) (C.C.A.) 247. The doctrine of equitable lien has been carried quite as far by the courts of New York as by those of any other jurisdiction. Under the law of that State, we are of opinion that these facts establish an equitable lien in favor of Adams. As was said by Cardozo, J., in *Schoenherr* v. *Van Meter,* 215 N. Y. 548, at page 552, "The plastic remedy of an equitable lien is adequate in such case to prevent a failure of justice." *Schermerhorn* v. *Gardenier,* 107

App. Div. (N. Y.) 564; affirmed in 184 N. Y. 612. *Perry* v. *Board of Missions of the Protestant Episcopal Church*, 102 N. Y. 99. *Muller* v. *Kling*, 209 N. Y. 239, 244. *Jessup* v. *Smith*, 223 N. Y. 203, 207. See *Klinzing* v. *Blauw Bros. Inc.* 160 N. Y. Supp. 631, 635, and cases cited. The cash thus finally deposited with the Trust Company was in substance and effect a fund in equity for the satisfaction of whatever claim Adams might be able to establish against it. The plaintiffs, having come into equity to assert rights to this cash, must do equity with respect to it. *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 428. *Bryne* v. *Dorey*, 221 Mass. 399, 405, 406. *Hall* v. *Bank of Baldwin*, 143 Wis. 303, 311.

This result follows both on the law of New York and on the law of this Commonwealth.

The parties have not put themselves in a position to argue and do not argue, as we understand it, that the Depositors are necessary parties to this proceeding. It does not appear that they have any rights which may be affected by the decree. *Currier* v. *Howard*, 14 Gray, 511, 513. *Jenkins* v. *Eliot*, 192 Mass. 474.

The exceptions to the master's report, so far as they relate to findings of fact, must be overruled. He was not required to make such findings as were requested. *Warfield* v. *Adams*, 215 Mass. 506, 520. So far as they relate to rulings of law, the exceptions are sound and must be sustained. But they do not affect the substantial rights of the parties, because all the material facts have been found and the rulings of law have been disregarded.

The motion to strike out parts of the report was rightly overruled. The order to that effect is to be affirmed. The decree affirming the master's report and overruling exceptions thereto is to be modified by sustaining exceptions to his rulings of law and as thus modified is affirmed. The final decree is reversed and a decree is to be entered ordering the Trust Company to pay Adams the amount in its hands with interest, less the sum which it is entitled to retain for charges and expenses, if the amount found to be due Adams under the agreement is equal to or in excess

of that balance; otherwise to pay Adams so much of the net amount in its possession as Adams is entitled to receive from the Depositors, and to pay the balance, if any, to the plaintiffs. The net amount for which the Trust Company is chargeable and the amount to which Adams is entitled are to be determined by the single justice. If there is no balance above these amounts, the bill of complaint is to be dismissed. The defendants are to recover costs in any event.

*Ordered accordingly.*