BOSTON SAFE DEPOSIT AND TRUST COMPANY, trustee, *vs.*
PAUL G. BECKER, administrator, & others.

Middlesex. November 9, 1962. — December 6, 1962.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Devise and Legacy,* Gift to one or his personal representative, Words of purchase or of limitation, Alternative provisions, Remainder. *Will,* Compromise. *Words, "Or."*

Rights of parties under an agreement of compromise of a will are contractual and not testamentary. [212–213]

Construing as a whole in the light of all the circumstances a will compromise agreement containing a provision that upon the death of the testator's daughter without issue, which occurred, certain trust principal should go to the testator's son "or his executors or administrators" and a further provision that upon the death of the last survivor of several persons, including the son, other trust principal should go to "the executors and administrators" of the son, it was held that the references to the son's personal representatives in both of such provisions were mere words of limitation and not words of purchase and that the son took under the first provision, irrespective of his surviving his sister, and also under the second provision, an assignable remainder interest which, upon his being adjudicated bankrupt, passed to his trustee in bankruptcy and by subsequent assignments passed to an assignee who was entitled to the trust principal when it became distributable. [213, 216–217]

PETITION for instructions filed in the Probate Court for the county of Middlesex on October 19, 1960.

The case was reported by *Monahan, J.*

*Joseph R. Watkins* stated the case.

*Joseph J. Krohn* (*Thomas H. Mahony* with him) for Becker, administrator.

*Mark M. Horblit* (*Arthur T. Wasserman & Samuel H. Kalish* with him) for Capitol Security Corporation.

CUTTER, J. This is a petition for instructions by the trustee (the trust company) under the will of Francis X. Fitzpatrick (the testator) as modified by an agreement of compromise executed on December 31, 1921 (the compromise agreement).[1] The trust company desires instructions as to the disposition of (a) "one-half of the property held by it as [t]rustee for the benefit of Ann F. Fitzpatrick" (Ann), and (b) "the property remaining in its hands as [t]rustee for the benefit of Antoinette R. Lawton" (Antoinette) and others. The answers admitted most of the allegations of the petition. The case has been reported without decision upon the pleadings and a statement of certain agreed facts.

The testator died on March 4, 1921. He left the residue of his estate to the trust company in trust to pay $225 per month to Antoinette for life and, subject thereto, to pay the income of one half of the residue to his son, James H. Fitzpatrick (James), for life with remainders over, and the income (subject to certain discretions) of the other half to his daughter, Ann, for life with remainders over, but subject to a proviso that if she should "marry one Crawford Dearth" her share was to be very greatly reduced. Ann opposed the allowance of the will.

By the compromise agreement, ten per cent of the residue (after payment of debts, expenses, and certain specified legacies) was to be paid to James. The balance of the residue (Excerpt A)[2] "shall be divided into two equal

---

[1] On January 12, 1922, the testator's will as compromised was allowed. It has been stipulated that the compromise agreement was actually executed on December 31, 1921, although it was dated December 31, 1922.

[2] For convenience in referring to the language later in this opinion, certain passages quoted from art. Sixth of the will as modified are described severally as (Excerpt A), (Excerpt B), etc.

parts; one part to go to Ann . . . and the other part to go to James . . . subject however to . . . trust provisions" thereafter set out.

The compromise agreement (see art. Sixth of the will as modified) then provided, (Excerpt B) "Out of Ann['s] . . . share there shall be paid to her outright" $25,000. The balance of Ann's share was to be held in trust (Ann's trust) by the trust company. From the net income $112.50 was to be paid each month to Antoinette during her life. The remaining net income was to be paid "to Ann . . . during her life." Ann's trust at her death was to be distributed, after certain payments and reserves not now relevant, (Excerpt C) "[i]f . . . Ann . . . should marry and die leaving issue surviving at her death, to her issue living at her death . . . . If . . . Ann . . . should die without leaving issue [then] living . . . *one-half to James H. Fitzpatrick, or his executors or administrators;* and the other half as Ann . . . shall by . . . will appoint and in default of such appointment to *James H. Fitzpatrick, his executors and administrators*" (emphasis supplied). Ann died leaving no issue on December 8, 1959, and appointed to her husband, Crawford Dearth, all the property which she had "power to appoint under the will and [compromise] agreement." The first prayer of this petition asks instructions as to the distribution of one half of Ann's trust under the provisions just quoted, amounting on December 22, 1961, to $144,744.

Article Sixth further provided, (Excerpt D) "The share of James . . . shall be paid over to him . . . outright, as soon as . . . legacies . . . and debts . . . have been provided for . . . except . . . $80,000 [Antoinette's trust], which shall be . . . reserved in trust by the" trust company to pay $112.50 monthly to Antoinette for life and the balance to Lucy, wife of James, during Antoinette's life. The agreement then provided that upon the death of Antoinette, which took place March 10, 1939, "one-half of the . . . [$80,000] trust fund . . . shall be paid over *to James H. Fitzpatrick or his executors or administrators . . .*"

(emphasis supplied).[3]   After provisions to be applicable in case Antoinette should die before Lucy (an event which did not happen) the balance of the trust fund was dealt with as follows, (Excerpt E) "[I]f Lucy . . . dies before Antoinette . . . the . . . [trust company] shall first reserve . . . out of one-half of said trust fund . . . the sum of . . . $35,000 . . . to provide for the payment upon the death of the survivor of James . . . Lucy . . . and Ann . . . of one-half of . . . [certain] bequests to . . . charitable institutions . . . and shall pay over the balance of one-half of said trust fund . . . after reserving . . . said fund of . . . $35,000 . . . to . . . *James H. Fitzpatrick, or his executors or administrators,* and shall also pay to said *James H. Fitzpatrick, or his executors or administrators,* the net income from said sum of . . . $35,000 . . . until the death of the survivor of James . . . Lucy . . . and Ann . . . and shall pay over *to James H. Fitzpatrick or his executors or administrators* the balance of net income from the fund reserved for" Antoinette's annuity (emphasis supplied).

Then, after a further provision,[4] art. Sixth provided, (Excerpt G) "Upon the death of the last survivor of James . . . Ann . . . and Lucy . . . if Antoinette . . . is then living, the . . . [trust company] out of the . . . trust fund shall pay over twenty-five thousand dollars to . . . [certain] charitable institutions, . . . and shall reserve cash . . . to support the . . . annuity . . . for . . . Antoinette . . .

---

[3] James was still living at Antoinette's death.  See the discussion of the distribution that then took place, *infra.*

[4] This further provision (of importance only because its language may be of assistance in interpreting other parts of art. Sixth) reads, (Excerpt F) "If Lucy . . . survives Antoinette . . . then upon the death of . . . Lucy . . . the trustee shall first reserve . . . out of one-half of said original [$80,000] fund . . . $35,000 . . . to provide for the payment upon the death of the survivor of James . . . Lucy . . . and Ann . . . one-half of the bequests to . . . [certain] charitable institutions . . ., and shall pay over the balance of one-half of said trust fund . . . after reserving . . . said sum of thirty-five thousand dollars to *James H. Fitzpatrick, if living,* and shall also pay to said James . . . the net income from said trust fund of . . . $35,000 . . . until the death of the survivor of James . . . Lucy . . . and Ann . . ., but *if on the death of Lucy . . . James . . . is not living,* then the payment referred to in this paragraph *that would be made to James H. Fitzpatrick, if living, shall be made to his executors and administrators*" (emphasis supplied).

and shall pay over the balance of the principal . . . of the . . . fund . . . *to the administrators and executors of* . . . *James* . . . and during the life of . . . Antoinette . . . shall pay . . . to the *executors or administrators of* . . . *James* . . . any income remaining after the payment . . . monthly to . . . Antoinette . . . and upon the death of . . . Antoinette . . . shall pay over to the *executors and administrators of* . . . *James* . . . any of the principal and income of the said trust fund . . . then remaining'' (emphasis supplied).

The second prayer of the present petition asks instructions as to the distribution of $7,206, remaining (as of December 22, 1961) after the distribution of $25,000 to certain charities at Ann's death in 1959.

On September 5, 1922, an involuntary bankruptcy petition was filed against James. On March 18, 1924, he was adjudicated bankrupt on this petition. Trustees in bankruptcy duly qualified. Lucy, wife of James, died June 3, 1924. Later in 1924, the trust company filed a petition for instructions with respect to the portion of Antoinette's trust (see Excerpt E, *supra*) which prescribed the payments to be made in the event, which had then happened, of Lucy's death before Antoinette's death. This petition was considered (with another matter) in *National Shawmut Bank* v. *Fitzpatrick*, 256 Mass. 125, decided in 1926. See fn. 8, *infra*. As a consequence of that decision, the trust company was instructed to pay to James's trustees in bankruptcy the part of the principal that then would have been payable to James, if he had not been adjudicated bankrupt, and also the remaining net income of Antoinette's trust after deducting Antoinette's annuity.

On January 14, 1928, the trustees in bankruptcy sold to one Spiel their interest (a) in the trust property held by the trust company, and (b) in the ''income accruing thereon . . . after January 1, 1928.'' Spiel on January 20, 1928, sold this interest to Capitol Security Corporation (Capitol).

The trust company paid to Capitol the income of Antoinette's trust in excess of her annuity until her death on

March 10, 1939.  The trust company, on July 27, 1940, paid to Capitol $43,532.29, reserving in trust $35,000 to provide for payment of certain charitable bequests.  James died intestate October 22, 1947.  The trust company continued to pay Capitol the net income of the $35,000 until Ann's death on December 8, 1959.  James never had any issue.  Ann was his sole heir at law.

The present controversy is between Capitol and Paul G. Becker, administrator d.b.n. of James's estate and also administrator d.b.n. c.t.a. of Ann's will (Becker).  The following are Becker's principal contentions.  (1) *As to Ann's trust.*  The remainder interest in Ann's trust, because it was limited (Excerpt C) to "James . . . or his executors or administrators," is "to be construed as one [given] primarily to . . . [James] or by way of substitution to his legal representatives," since he failed to survive to the end of Ann's preceding life interest.  James had "no title . . . in the substitutionary gift to be taken by his executors or administrators."  They are described in the compromise agreement by words "used as words of purchase, not as words of limitation."  James's administrator takes this fund, not as part of James's estate but "upon a separate and distinct trust for . . . [James's] statutory next of kin."  (2) *As to Antoinette's trust.*  The gift (see Excerpt G, *supra*) "to the administrators and executors of . . . James" is to these fiduciaries, described by words of purchase, "of something which James was in no event to take."  Capitol contends that James took by the compromise agreement an assignable remainder interest in one half the trust fund of Ann's trust, and in the balance remaining in Antoinette's trust, which passed to James's trustees in bankruptcy and by assignment to Spiel and then to Capitol.

1.  The original will was so greatly altered by this compromise agreement as to make irrelevant inquiry about the intent of the testator.  The parties' rights are contractual and now rest upon the interpretation of the compromise agreement.  See *Ellis* v. *Hunt*, 228 Mass. 39, 43–44; *For-*

*bush* v. *Home for Aged Women,* 241 Mass. 433, 435–436;
*Budin* v. *Levy,* 343 Mass. 644, 649. See also *Newburyport
Soc. for Relief of Aged Women* v. *President & Fellows of
Harvard College,* 310 Mass. 438, 442.

2. The present issue with respect to Ann's trust arises
principally because of the disjunctive language (see Ex-
cerpt C, *supra*) used in the remainder gift to James, which
in fact took effect, i.e., to "James . . . *or* his executors or
administrators" (emphasis supplied). In the immediately
following gift in default of any appointment by Ann, the
gift was expressed, "to James . . . his executors and ad-
ministrators." If both gifts had been expressed as the
default gift was, there would be little doubt (a) that these
remainder gifts vested in James as of the testator's death
(see *Old Colony Trust Co.* v. *Tufts,* 341 Mass. 280, 283–
285; *O'Connell* v. *Frost, ante,* 194, 197) and (b) that the
words "executors" and "administrators" were not words
of purchase, but merely redundant words of limitation, em-
phasizing that James was to take an indefeasible remainder
interest.

The gift of the remainder "to James . . . or his execu-
tors or administrators" may be interpreted, under a rec-
ognized rule of construction, as a gift to James, if living
when the gift takes effect in possession, or, if he is not then
living as a gift to his personal representative, as a pur-
chaser, upon a "referential" trust to distribute the trust
property in the same manner as James's estate would be
distributed. See Restatement: Property, § 252.[5] The
authorities supporting such an interpretation of disjunctive
language would require that James survive Ann in order

---

[5] Section 252 reads, "ALTERNATIVE LIMITATION EMPLOYING THE WORD 'OR.'
In a limitation purporting to create a remainder . . . in 'B or his children,'
or in 'B or his issue,' . . . or by other language of similar import, the alterna-
tive form tends to establish as to the interest of B that (a) a requirement of
survival to the end of all preceding interests exists; and (b) such survival is a
condition precedent of such interest." Section 252, comment c, states that:
". . . a limitation of a remainder . . . 'to B or his heirs,' or 'to B or his
representatives' . . . constitutes 'language of similar import' under the rule
stated in this [s]ection, but the strength of the constructional preference . . .
is lessened by the fact that such language is also susceptible of being con-
strued to describe the completeness of the disposition in favor of the first
taker (B) rather than as limiting alternative interests."

for him or his estate to take in his own right. See *Robertson* v. *Robertson,* 313 Mass. 520, 521, 528–530 (to A, B, and C in stated shares "or to the issue of any . . . then . . . dead"); *Old Colony Trust Co.* v. *Barker,* 332 Mass. 533, 534–535; *Ebey* v. *Adams,* 135 Ill. 80, 88–91; *Matter of Evans,* 234 N. Y. 42, 44–47; *Wyman* v. *Kinney,* 111 Vt. 94, 99–105; annotation, 128 A. L. R. 306. See also *Gaynor's Case,* 217 Mass. 86, 89–90; *Estate of Brunet,* 34 Cal. 2d 105, 107, 109 (devise to O "or his [e]state" held to mean that, if O predeceased the testator, the property was to go to O's heirs or devisees); *Leonardini* v. *Wells Fargo Bank & Union Trust Co.* 131 Cal. App. 2d 9, 13–17. Cf. *Appleton* v. *Rowley,* L. R. 8 Eq. 139, 144–145.[6] We assume that, if the words "or his executors or administrators" in Ann's trust are properly to be construed as words of purchase, the property passing to James's administrator may be held upon a "referential" trust to be disposed of by the administrators (since James left no will) to James's heir as herself indirectly designated as beneficial remainderman in the original gift. See *National Shawmut Bank* v. *Joy,* 315 Mass. 457, 462–467.[7]

With the authorities just cited in mind, we examine art. Sixth in the context of the will and the whole compromise agreement. See *Clark* v. *State Street Trust Co.* 270 Mass. 140, 151–152. It is plain that the compromise resulted

---

[6] Even where a gift is not disjunctive in form, terms, such as "heirs," "executor," or "administrators," on occasion have been treated essentially as words of purchase when used to describe interests following a life interest. See *Sands* v. *Old Colony Trust Co.* 195 Mass. 575, 576, 579–580 (gift in trust for the settlor for life, and at his death "to my . . . heirs, provided . . . I have . . . [no] will. . . . And . . . [at] my death leaving a will . . . to . . . [my] executor"; *Matter of Thompson,* 274 App. Div. (N. Y.) 49, 51–55 (trust remainder to E's [life beneficiary], executors or administrators, provided he leave a child, was held to mean that the remainder was to go to E's testamentary appointees or, if E left no will, to those who would take by intestacy). See also *Commissioner of Corps. & Taxn.* v. *Baker,* 303 Mass. 606, 611–613; *Commissioner of Internal Revenue* v. *Bateman,* 127 F. 2d 266, 269 (1st Cir.).

[7] Other cases dealing with analogous problems are *Bemis* v. *Fletcher,* 251 Mass. 178, 187–188, *Leary* v. *Liberty Trust Co.* 272 Mass. 1, 3, 6–7, *New England Trust Co.* v. *Faxon,* 343 Mass. 273, 282–283, *Boston Safe Deposit & Trust Co.* v. *Boston Safe Deposit & Trust Co.* 343 Mass. 695, *Matter of Fowles,* 222 N. Y. 222, 231–234, *Lord Advocate* v. *Bogie,* [1894] A. C. 83, 91–92, *In re Cousens' Will Trusts,* [1937] Ch. 381, 387, *In re Wray,* [1951] Ch. 425.

from an effort by the testator's children to dispose of his property between themselves, subject only to annuities and to relatively small gifts to charities and to relatives. A primary reason for the will contest by Ann and for the compromise, of course, was the restriction in the will upon Ann's interest if she should marry Crawford Dearth, as she obviously intended to do. The compromise agreement also strongly indicates that James was trying to obtain complete control over whatever part of his father's estate was to pass to him. Although most of Ann's share was left in trust, the "share of James" (see Excerpt D, *supra*) was not subjected to any trust except for the purpose of protecting the interests of Lucy, Antoinette, and the charities. Indeed, one purpose of placing Ann's share in trust may have been to protect James's remainder interests. See Excerpt C, *supra.*

Article Sixth is complicated and in it the use of language is not wholly consistent. See, for example, the slightly differing references in Ann's trust (Excerpt C, *supra*) "to James . . . or his executors or administrators" and to "James . . . his executors and administrators," and to these fiduciaries in Antoinette's trust. See Excerpts E, F, and G, *supra.* Such lack of consistency as exists suggests absence of precision in the use of language and that the words used and the variations in usage may be fortuitous rather than by design. See *Rockland-Atlas Natl. Bank* v. *Massachusetts Bonding & Ins. Co.* 338 Mass. 730, 735. In Excerpt F (fn. 4, *supra*) and in Excerpt G, the language most closely approaches that which would be used if the references to executors and administrators were intended to cause them to take as purchasers. If this language were so to be interpreted, by contrast the more general disjunctive language of Ann's trust might well be taken as words of limitation, meaning only that in the event of James's death prior to termination of the trusts, payment was to be made to his administrators for distribution as part of his estate. See discussion in *Commissioner of Corps. & Taxn.* v. *Second Natl. Bank,* 308 Mass. 1, 8–10. On the facts, we

see no reason to suppose that any of the references to James's administrators meant more than that they were to take his interest, as part of his estate, if he was not alive when distribution took place.

We get little help in interpreting art. Sixth from the circumstance that the involuntary bankruptcy petition against James followed the compromise agreement within a few months. This may indicate that James in January, 1922, was financially embarrassed and needed to control outright every available asset. This circumstance, on the contrary, might have provided incentive for James to attempt to protect his heirs against his creditors in the enjoyment of the remainder interests under Ann's and Antoinette's trusts. If this had been a conscious purpose, it would have been natural for the parties to provide such protection in more explicit terms to the extent that they could successfully do so. See *Ware* v. *Gulda,* 331 Mass. 68, 70–72. See also *Forbes* v. *Snow,* 245 Mass. 85, 89; *Merchants Natl. Bank* v. *Morrissey,* 329 Mass. 601, 605.[8]

In the light of all the considerations mentioned above, we conclude that the compromise agreement was intended to provide that any present or future interest in the testator's estate from which James might benefit was to be his outright. We recognize that, in appropriate circumstances, the principles set out in Restatement: Property, § 252, and in *Sands* v. *Old Colony Trust Co.* 195 Mass. 575 (fn. 6, *supra*), may be applied. As a matter of interpretation of this compromise agreement, however, we think that Ann and James (essentially rewriting their father's will and resettling his property as if it were theirs) treated all James's interests as fully vested in him (subject, of course, in the case of Ann's trust to the possibility that she might

---

[8] In interpreting these remainder dispositions, we receive no assistance from the 1926 decision (256 Mass. 125). James was still alive in 1926 and the issues now raised (with respect to remainder interests) were not then ripe for consideration. The 1926 case, which need not now be reviewed, dealt with (a) the payment of principal from Antoinette's trust to which at Lucy's death James would have been entitled, if he had not theretofore become bankrupt, and (b) then current income payments under that trust to James. (See Excerpt E, *supra*.)

leave issue) and that all references throughout art. Sixth to James's executors and administrators were intended to be merely words of limitation and not words of purchase. Because of this conclusion, we reach the same result with respect to the balance in Antoinette's trust as with respect to the half interest in Ann's trust.

Our conclusion is supported by *Forbes* v. *Snow,* 245 Mass. 85, 89–92. There it was said (p. 91) of a somewhat comparable provision that the form of gift indicated that the share to be paid to a deceased child's ''legal representatives'' was to be a ''vested equitable remainder'' and was to go ''to the estate of the child to be its assets and not to be distributed as assets of the testator's estate.'' The share then passed to the child's trustee in bankruptcy.

3. A decree is to be entered instructing the trust company to distribute to Capitol (a) that one half of the property held in Ann's trust which was payable under the compromise agreement ''to James . . . or his executors or administrators,'' and (b) the property remaining in Antoinette's trust and payable under the compromise agreement to the executors and administrators of James. Costs and expenses are to be in the discretion of the Probate Court.

*So ordered.*